STATE OF NORTH CAROLINA v. RYAN GABRIEL GARCELL

No. 465A06

(Filed 20 March 2009)

**1. Appeal and Error; Jury— preservation of issues—challenge for cause of prospective juror—failure to follow statutory requirements**

   Although defendant contends the trial court abused its discretion in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by denying defendant's challenge for cause to the twelfth juror seated based on her personal knowledge of the victim, the victim's son, and defendant's ex-girlfriend, defendant failed to properly preserve this issue because: (1) although defendant met two of the three requirements of N.C.G.S. § 15A-1214(h) when he exhausted all of his peremptory challenges and had his renewal motion denied, he failed to satisfy the remaining requirement to renew his challenge as provided in N.C.G.S. § 15A-1214(i); and (2) the statutory procedure is mandatory and must be followed precisely.

**2. Jury— capital selection—excusal for cause—death penalty views**

   The trial court did not abuse its discretion in a capital first-degree murder case by excusing three prospective jurors for cause based on their answers to questions concerning the death penalty because: (1) each of the three potential jurors made statements raising a substantial question regarding his or her ability to follow the law on the death penalty; and (2) the answers from all three prospective jurors ultimately revealed an unequivocal denial of their personal ability to consider the death penalty in the instant case.

**3. Jury— voir dire—life sentence without parole**

   The trial court did not abuse its discretion in a capital first-degree murder case by sustaining the State's objections to voir dire questions concerning the prospective juror's views of a sentence of life without parole and whether the juror felt that the death penalty is more or less harsh than life in prison without parole because: (1) a defendant does not have a constitutional right to question the venire about parole; (2) defendant is guar-

anteed under N.C.G.S. § 15A-2002 that the trial court shall instruct the jury that a sentence of life imprisonment means a sentence of life without parole; and (3) the form of the questions defense counsel posed resembled those the Supreme Court previously analyzed and concluded the trial court rationally sustained the objections.

**4. Evidence— letter from jail—relevancy**

The trial court did not abuse its discretion in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by admitting into evidence under N.C.G.S. § 8C-1, Rule 401 the letter defendant wrote to his mother from jail, and concluding it was not unduly prejudicial under N.C.G.S. § 8C-1, Rule 403, because: (1) the letter constituted defendant's admission to the crime in his own words and thus was relevant to defendant's involvement in the crime and his deliberation of the murder; (2) defendant's account of the crime in the letter, although partly fictional, reflected a calculated murder of the victim for her money and goods without any provocation; (3) the letter was not needlessly cumulative because it was the only piece of evidence originating directly from defendant reflecting his acute memory of significant details from the crime scene; (4) defendant's brief dissected statements out of the letter highlighting their emotional nature that misrepresented the overall nature, relevancy, and use of the letter at trial; and (5) any emotional impact from the letter might have benefitted defendant since it could have suggested the nonstatutory mitigator defendant proposed that at the time of the offense defendant had developed to the mental/emotional age of only a 10-12 year old child, and defendant has little ground to complain on appeal regarding the letter's effect when defense counsel at trial asked the jury to study its significance as supportive of defendant's mitigating evidence.

**5. Evidence— testimony—number of prior killings—plain error analysis**

The trial court did not commit plain error in a capital first-degree murder case by allowing a witness's testimony concerning an extrajudicial question regarding how many people defendant had killed because: (1) defendant acknowledged the comment was brief, and the prosecutor immediately moved on to a different line of questioning; (2) nowhere else in nearly 1,400 pages of transcript does the question of defendant's prior involvement in

any other killings arise, and defendant points to nothing else to indicate the jury inferred defendant had been involved in killing other individuals; and (3) absent this statement, there was no probability the jury would have found defendant not guilty based on the overwhelming evidence of guilt, nor was the error so fundamental that it constituted a miscarriage of justice.

**6. Evidence— testimony—violent acts and fear of defendant after crimes committed—plain error analysis**

The trial court did not commit plain error in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by admitting the testimony of two witnesses concerning defendant's violent acts and their fear of defendant after the crimes occurred, because: (1) testimony of their fear had some tendency as circumstantial evidence to make the existence of defendant's guilt more probable; (2) the testimony exhibited the tension and stress defendant and his girlfriend displayed after committing the crimes; (3) defendant's outlandish response to an undercooked meal could have indicated nervousness, stress, or tension due to his suffering under the burden of committing the crimes and was relevant since it bore on defendant's relationship with his girlfriend, which was central to the defense's theory of the case at trial that his girlfriend could manipulate defendant into doing anything; (4) the evidence was not offered as mere character evidence for the purpose of proving that defendant acted in conformity therewith on a particular occasion; and (5) even assuming *arguendo* that the evidence was prejudicial, it cannot be concluded that the danger of unfair prejudice substantially outweighed the evidence's probative value, that absent its admission the jury would have probably found defendant not guilty, or that its admission caused a miscarriage of justice.

**7. Evidence— extrajudicial witness statements—corroboration**

The trial court did not err or commit plain error in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by admitting into evidence extrajudicial statements from three State witnesses because: (1) the trial court informed the jurors at length that they could consider statements made during the interviews only for corroboration purposes when they weighed the credibility of the witnesses' trial testimony; (2) the trial court explained that any statement made prior to this trial not under

oath cannot be used as evidence of anything that the State is complaining of or as substantive evidence of anything that occurred or did not occur; (3) the pertinent testimony was not hearsay since it was offered as corroboration evidence and not substantive evidence, and variations affect only the credibility of the evidence which is always for the jury; and (4) the testimony recounting the interviews reflected that the narration of events was substantially similar to each witness's in-court testimony.

**8. Witnesses— sequestering—exposure to prior testimony**

The trial court did not abuse its discretion in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by failing to sequester certain witnesses, which led to at least one witness testifying based on exposure to prior testimony, because: (1) despite citing due process concerns to the trial court, defendant failed to adequately develop a constitutional claim on appeal and has thus abandoned any such argument; and (2) defendant only raised a specific concern regarding the ability of the codefendants to hear one another's testimony, the trial court made a rational decision to sequester the codefendants, and beyond that, the trial court had little, if any, reason to conclude that sequestering all witnesses was beneficial to the administration of justice.

**9. Criminal Law— prosecutor's argument—coparticipant not proud of crime and scared to death—broader context of describing how defendant was apprehended**

The trial court did not abuse its discretion in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by failing to intervene *ex mero motu* during the guilt-innocence phase closing arguments when the prosecutor stated that defendant's girlfriend, a coparticipant in the crimes, was probably not proud of the crimes, she was probably scared to death, and that was why she told defendant's sister, because, (1) the prosecutor made this comment in the broader context of describing how defendant was apprehended by law enforcement partly since he confessed to the murder and partly because his girlfriend spoke with his sister about the crimes; (2) the comment regarding the girlfriend's emotional state and motive for speaking with defendant's sister was brief, and the statement had little bearing on the jury's ultimate determination of defendant's guilt; and (3) the prosecutor's com-

ment was brief and was not an unreasonable inference in light of the testimony from the sister's boyfriend concerning how "tense" the situation was after the date of the crimes at the residence he shared with defendant's sister, defendant, and defendant's girlfriend, and the boyfriend testified that defendant was "kind of touchy" and more easily angered.

**10. Sentencing— polling jurors—failure to inquire why jurors requested reference to individual juror numbers**

The Court of Appeals exercised its discretion under N.C. R. App. P. 2 and determined that the trial court did not err in a capital first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon case by failing to inquire why jurors requested to be referred to by individual juror numbers before the sentencing proceeding began the day after they returned verdicts of guilty and were polled by name because: (1) defendant's argument was based on pure speculation, any number of reasons could have motivated jurors' request for anonymity, and defendant acknowledged that ultimately the jurors' concern was unspecified and unknown; (2) without the trial court's receiving any information other than the bare request from the jury, it cannot be said that the trial court had a substantial reason to question jurors as to whether they had been exposed to improper and prejudicial matters; and (3) a request from the jury to be referred to by number and not by name is neither a de facto indicator that the jury has been improperly exposed to an external influence nor a de facto indicator of prejudice against defendant.

**11. Sentencing— aggravating circumstances—previous violent felony conviction—second-degree kidnapping**

The trial court did not commit plain error by submitting second-degree kidnapping convictions to the jury as support for finding the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person because: (1) it is logical to view the two counts of second-degree kidnapping as involving an inherent use or threat of violence when committed in the same course of action as the inherently violent crime of common law robbery that was also submitted to support this circumstance; (2) even assuming *arguendo* it was error to submit the kidnapping convictions, any possible error was harmless beyond a reasonable doubt and not unduly prejudicial to defendant's case when

STATE v. GARCELL

[363 N.C. 10 (2009)]

defendant's conviction for common law robbery was sufficient alone for the jury to find the existence of the (e)(3) aggravator; and (3) there was no reasonable possibility the jury would have returned a different sentencing recommendation had the kidnapping convictions not been submitted to the jury when the jury found the N.C.G.S. § 15A-2000(e)(5) and (e)(9) aggravators, and the jury deliberated on defendant's punishment for approximately two and one-half hours.

**12. Sentencing— aggravating circumstances—previous violent felony convictions—second-degree kidnapping—instructions**

The trial court did not commit plain error in a capital sentencing proceeding in its definition of second-degree kidnapping in the instruction permitting the jury to use kidnapping convictions as support for finding the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance of a previous conviction of a felony involving the use or threat of violence to the person because: (1) the trial court's partial description of second-degree kidnapping was a correct statement of the law and was only a definition, not a peremptory instruction that defendant had in fact acted in any manner reflected therein; (2) in light of its inherent element of violence, submitting the common law robbery conviction alone was sufficient to support the (e)(3) aggravator, and that was the sole focus of the prosecutor during his closing argument when asking the jury to find that aggravating circumstance; (3) the jury found two other aggravating circumstances in addition to the (e)(3) aggravator to weigh against the mitigating circumstances, and jurors deliberated for approximately two and one-half hours before recommending death; and (4) no reasonable possibility existed that the jury's recommendation would have been different had no error occurred, the instruction was not so unduly prejudicial as to lead to the conclusion that justice was not done, and any possible error was harmless beyond a reasonable doubt.

**13. Sentencing— motion for appropriate relief—second-degree kidnapping instruction—effective assistance of counsel**

Defendant's motion for appropriate relief in a capital first-degree murder case regarding alleged errors, including the second-degree kidnapping instruction in a sentencing proceeding instruction on the prior violent felony aggravating circumstance and alleged ineffective assistance of counsel based on failure to object to submission of the kidnapping charges to the jury

or to the jury instruction regarding those charges, is denied because: (1) the pertinent instruction simply contained a partial definition based on N.C.G.S. § 14-39(a) that was a correct statement of the law and was not a peremptory instruction on any specific acts defendant had in fact committed; (2) in light of a prior common law robbery conviction and its inherent element of violence, the instruction did not tilt the scales of justice against defendant and constitute plain error when the jury would have come to the same result regardless of any error; (3) given defendant's description of the facts, the image of defendant placing the barrel of a firearm on the neck of a middle-aged female store clerk and ordering her to lie on the floor while she begs for her life so the robbery can be carried out left little, if any, doubt that violence or the threat of violence was used during the commission of these crimes; and (4) in regard to the ineffective assistance of counsel claim, defense counsel's performance at trial was objectively reasonable, and even assuming it was not, defendant clearly cannot demonstrate the requisite component of prejudice.

**14. Sentencing— aggravating circumstances—prior violent felonies—mitigating circumstances—no significant history of prior criminal activity—effective assistance of counsel**

The trial court did not commit plain error in a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(3) aggravator concerning prior violent felonies to the jury based on crimes including common law robbery and two counts of second-degree kidnapping that occurred before defendant was eighteen years old, and by its instruction stating the jury could consider the crimes in determining whether the (f)(1) mitigator of no significant history of prior criminal activity existed, because: (1) contrary to defendant's assertion, *Roper v. Simmons*, 543 U.S. 551 (2005), held that the Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed; it concerned a defendant's age at the time he committed a capital crime instead of when his case was tried and he was sentenced; it did not preclude, or even address, the jury's ability during the sentencing proceeding to consider a defendant's acts or behavior that occurred before the age of eighteen; and defendant in this case committed a capital crime after he turned eighteen years old; (2) the jury was asked to consider the relevance of defendant's age at the time of the capital crime as a statutory and nonstatutory mit-

igating circumstance; and (3) in regard to defendant's alleged ineffective assistance of counsel claim pertaining to this issue, defendant can establish neither deficient performance by counsel nor prejudice when *Roper* has no application to this case and defense counsel specifically referred to *Roper* during the closing arguments of the penalty proceeding to persuade the jury to view defendant's age as mitigating.

**15. Sentencing— statutory mitigating circumstances—defendant's age—instruction—effective assistance of counsel**

The trial court did not commit plain error in a capital first-degree murder case by its instruction on the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance regarding defendant's age at the time of the crime because: (1) the State did not stipulate to defendant's age as constituting a mitigating circumstance, and thus, a mandatory peremptory instruction was not required; (2) unless a defendant's age has mitigating value as a matter of law, a juror need consider the defendant's age as mitigating only if that juror finds by a preponderance of the evidence that his age has mitigating value; (3) although a forensic psychiatrist testified about defendant's "immaturity" and stated that defendant's emotional age was more of a 10 to 12 year old child who had not grown up, cross-examination drew out potential indicators of maturity in defendant's behavior including that defendant's prison record reflected calculated acts of violence committed against other inmates, and defendant was seen as a leader by some of his friends; and (4) in regard to defendant's alleged ineffective assistance of counsel claim pertaining to this issue, defendant can establish neither deficient performance by counsel nor prejudice when the jury instruction mirrored the pattern instruction and complied with the precedent of the Court of Appeals, defense counsel vigorously argued to the jury that defendant's age had mitigating value, and counsel submitted nonstatutory mitigators based on his client's age and immaturity for the jury's consideration.

**16. Sentencing— nonstatutory mitigating circumstances— failure to request instruction at trial—effective assistance of counsel**

The trial court did not err or commit plain error in a capital sentencing proceeding by failing to provide peremptory instructions *ex mero motu* on four nonstatutory mitigating circumstances because: (1) defense counsel did not request peremptory

STATE v. GARCELL

[363 N.C. 10 (2009)]

instructions at trial and thus waived any entitlement defendant may have had to them; (2) while N.C. R. App. P. 10(c)(4) allows criminal defendants to make alleged errors not objected to at trial the basis of assignments of error when plain error is distinctly contended, the Court of Appeals has previously held that a trial court is not required to sift the evidence for every possible mitigating circumstance which the jury might find, nor must it determine on its own which mitigating circumstance is deserving of a peremptory instruction in defendant's favor; and (3) in regard to defendant's alleged ineffective assistance of counsel claim pertaining to this issue, defendant cannot demonstrate the requisite component of prejudice since even when a peremptory instruction is given, jurors may reject a nonstatutory mitigating circumstance if they do not deem it to have mitigating value.

**17. Sentencing— nonstatutory mitigating circumstances—failure to give individualized instructions**

The trial court did not commit plain error in a capital sentencing proceeding by failing to give individualized instructions on each of the nonstatutory mitigating circumstances submitted to the jury after having given individualized instructions on the three statutory mitigating circumstances submitted because: (1) contrary to defendant's assertion, the trial court in no way, explicitly or implicitly, suggested that the nonstatutory mitigators were of less significance or were less worthy of consideration; (2) all of the mitigators were referred to as being equal in importance, and the manner in which they were presented did nothing to value some below others; and (3) if anything, the trial court's manner of presentation spared the jury the experience of hearing the same individualized instruction repeated twenty-four times.

**18. Sentencing— prosecutor's arguments—references to defendant's constitutional rights**

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene *ex mero motu* to halt the prosecutor's references to defendant's constitutional rights during the closing argument because: (1) the Court of Appeals has declined to find gross impropriety in similar cases; (2) the prosecutor encouraged the jury to consider that the victim as a human being possessed certain "rights," and the jury needed to contemplate its decision in light of those rights and in light of defendant's complete disregard for his victim's rights; and (3) the prosecutor never disparaged defendant for exercising his rights

as an accused criminal, nor did he imply defendant somehow deserved the death penalty because he had exercised his rights.

**19. Sentencing— prosecutor's arguments—community standard—personalized jurors to the crime**

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene *ex mero motu* when the prosecutor allegedly urged the jury to deter crime in general and allegedly personalized the crime to the jurors during closing arguments because: (1) regarding the prosecutor's reference to a community standard, it is not improper for the State to remind the jurors that they are the voice and conscience of the community, and jurors may also be urged to appreciate the circumstances of the crime; (2) regarding comments that allegedly personalized the jurors to the crime, it is permissible for the prosecution to ask the jury to imagine the emotions and fear of a victim, and the prosecutor asked the jury to appreciate the circumstances of the crime and permissibly made arguments related to the nature of defendant's crime; (3) particularly when a prosecutor is arguing that the murder was especially heinous, atrocious, and cruel, it is permissible to ask jurors to imagine the situation based on the evidence and to facilitate a thorough and meticulous contemplation of the crime; (4) the prosecutor never descended to degrading comments or conclusory "name-calling"; and (5) even assuming *arguendo* the prosecutor's remarks were improper, it cannot be concluded that they were grossly improper to the extent they violated defendant's rights when viewed in the larger context of the prosecution's entire closing argument.

**20. Sentencing— death penalty—proportionality**

The trial court did not err by sentencing defendant to death in a first-degree murder case because: (1) the jury found three aggravating circumstances including under N.C.G.S. § 15A-2000(e)(3) that defendant had been previously convicted of a felony involving the use or threat of violence to the person; under N.C.G.S. § 15A-2000(e)(5) that the murder was committed while defendant was engaged in the commission of a robbery; and under N.C.G.S. § 15A-2000(e)(9) that the murder was especially heinous, atrocious, or cruel; (2) defendant manhandled, brutally choked, and strangled his victim, a seventy-one year old woman, to death within the perceived sanctuary of her own residence; (3) defendant's sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; (4)

defendant's sentence of death was not excessive or dispropor-tionate when compared to the penalties imposed in similar cases; (5) defendant was convicted of first-degree murder on the basis of malice, premeditation and deliberation and felony murder; and (6) the victim was needlessly murdered, only for the sake of defendant's desire for material possessions.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judg-ment imposing a sentence of death entered on 4 April 2006 by Judge James U. Downs in Superior Court, Rutherford County, upon a jury verdict finding defendant guilty of first-degree murder. On 19 July 2007, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. On 7 December 2007, defendant filed a motion for appropriate relief in this Court. Heard in the Supreme Court 5 May 2008.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, and Daniel P. O'Brien, Assistant Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender; and Center for Death Penalty Litigation, by Thomas K. Maher, for defendant-appellant.*

BRADY, Justice.

On 22 June 2004, defendant Ryan Gabriel Garcell robbed seventy-one year old Margaret Hutchins Bennick (Mrs. Bennick or victim) in her residence with the use of a firearm and then strangled her to death. On 30 March 2006, a Rutherford County jury declared defend-ant guilty of first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. Defendant was sentenced to death for the first-degree murder. After reviewing the record and arguments of counsel, we find no error in defendant's convictions or sentences.

## PROCEDURAL BACKGROUND

The Rutherford County Grand Jury returned a true bill of in-dictment on 12 July 2004 charging defendant with robbery with a dangerous weapon, a true bill of indictment on 27 September 2004 charging defendant with conspiracy to commit armed robbery, and a superseding true bill of indictment on 8 February 2006 charging defendant with first-degree murder. Defendant was tried capitally, and the jury returned verdicts of guilty on all charges on 30 March

2006. Following the required penalty proceeding, the jury made a binding recommendation on 4 April 2006 that defendant be sentenced to death, and the trial court entered judgment accordingly. The trial court also sentenced defendant to consecutive prison terms of 77 to 102 months for robbery with a dangerous weapon and 29 to 44 months for the conspiracy conviction. Defendant appeals the judgment of the trial court sentencing him to death pursuant to N.C.G.S. § 7A-27(a). Defendant's additional judgments are also before us because we allowed his motion to bypass the Court of Appeals as to his noncapital convictions.

## FACTUAL BACKGROUND

In June 2004 defendant and his girlfriend, Kaylee Proctor, resided in a mobile home belonging to defendant's half sister and her boyfriend in Rutherford County. Proctor was pregnant with defendant's child. Neither defendant nor Proctor was gainfully employed, and the couple were in need of cash. Proctor initiated discussions with defendant about robbing Mrs. Bennick, who resided several miles from them on Old Caroleen Road. Mrs. Bennick had lived in Rutherford County all her life and worked part-time at a Goody's Family Clothing store. Proctor knew Mrs. Bennick from Proctor's earlier relationship with Mrs. Bennick's grandson.

### The Crimes

Defendant and Proctor agreed to rob Mrs. Bennick. At their residence on 22 June 2004, defendant and Proctor divulged their plan to three of their friends, Jerome, Anthony, and Quntia Davis.[1] As defendant described the plan, he pointed a firearm at one of the boys, saying they could go along or stay at the residence "and be dead too." The three friends felt intimidated into accompanying defendant and Proctor. Shortly before leaving to carry out the robbery, defendant telephoned Mrs. Bennick's residence to confirm she was at home.[2] Defendant stated he would have to kill Mrs. Bennick after robbing her.

Defendant, Proctor, Jerome, Anthony, and Quntia traveled to Mrs. Bennick's residence in defendant's vehicle, with Proctor providing

---

1. Jerome and Anthony are brothers, and Quntia is their cousin. Their ages at the time of the crimes were 18, 16, and 14, respectively. The three often spent time with defendant, sometimes eating meals and spending the night at defendant's residence.

2. A record of the telephone calls received at the victim's residence on 22 June 2004 reflects a one minute phone call shortly before 4:00 p.m. initiated from defendant's residence.

STATE v. GARCELL

[363 N.C. 10 (2009)]

directions. When they arrived, defendant made them wear latex gloves that he had brought. Defendant and Proctor went to the side door of the residence. When Mrs. Bennick came to the door, Proctor asked if Mrs. Bennick's grandson, Proctor's ex-boyfriend, was at the residence and then asked to use the telephone. Mrs. Bennick welcomed Proctor and defendant into her residence. At first they were pleasant with Mrs. Bennick, but Proctor became upset when Mrs. Bennick stated several times that she did not have any money. Defendant then grabbed the victim and placed his firearm to her head.

Proctor motioned for Jerome, Anthony, and Quntia to leave the vehicle and come inside the residence. Inside, Jerome and Anthony saw the victim lying facedown on the floor in a bedroom at the rear of the residence, and defendant was pointing his firearm at her. Jerome heard the victim begging, "Don't kill me," and promising she would not "call the cops" if defendant let her live. Defendant told his victim to be quiet or he would kill her. Defendant and Proctor told Jerome, Anthony, and Quntia to search for valuables. They ransacked the residence and carried groceries, a VCR, a game console, jewelry, a coin collection, and clothes outside to the vehicle. The victim pleaded with defendant to take anything he wanted as long as he did not kill her. Defendant stole the victim's automated teller machine (ATM) card and retrieved from her checkbook the personal identification number (PIN) required to access the victim's bank account.

Defendant then asked Proctor what she thought they should do with Mrs. Bennick. Proctor stated, "She can point me out. You are going to have to kill her. They are going to know who I am." For approximately ten minutes, defendant contemplated what to do while Proctor repeatedly encouraged him to kill the victim. Defendant told Jerome to come to the rear bedroom of the residence and to send Anthony and Quntia to the vehicle. As Anthony was leaving for the vehicle, he heard a gurgling sound coming from the rear bedroom. Jerome held the firearm while defendant sat on his victim's back and strangled her with his right arm around her neck. Proctor went outside to smoke a cigarette. When his victim ceased struggling or moving at all, defendant retrieved Proctor so she could check the victim's pulse. Jerome went to wait in the vehicle.

Approximately five minutes later, and after ransacking the residence, defendant and Proctor returned to the vehicle where Jerome, Anthony, and Quntia waited. With a smile on his face, defendant told them how he had "choked" and "killed" his victim and warned that

they better not "get cold feet" or they might "end up dead like that woman." Anthony testified defendant told them how, after strangling the victim, he wrapped an electrical extension cord around her neck and rode her limp body like a horse, saying, "Giddy up, giddy up." Defendant tied one end of the cord around his victim's neck and the other end around a bedpost in an attempt to make the murder appear like a suicide.

The group returned to defendant's residence for a short time and stored some of the stolen items in defendant's bedroom. They then went to defendant's mother's residence and presented her with some of the victim's jewelry, the coin collection, and the VCR as birthday presents. Defendant's mother inquired about his activities, and defendant confessed to the murder. Defendant's mother suggested ways to conceal his identity so he could use the stolen ATM card without being apprehended by law enforcement. The group traveled to various locations that night and the next night and used the ATM card. Before access to the victim's bank account was blocked on 25 June 2004, $1,790.35 in cash was fraudulently obtained.

The day after the murder, 23 June 2004, the victim's coworkers called her sister when she failed to arrive for her 5:00 p.m. work shift. Mrs. Bennick's grandson went to her residence and found it in disarray. He found her body in a rear bedroom of the residence with an electrical extension cord wrapped around her neck and tied to a bedpost.

Law enforcement immediately began an investigation. The crime scene yielded several items of direct and circumstantial evidence. The kitchen and other rooms were ransacked; a latex glove was found on the kitchen counter; latent fingerprint impressions indicated that the perpetrators wore gloves; and an ashtray with cigarette butts laid on the floor next to the victim's body.

During the last week of June 2004, defendant and his friend, Nate Whiteside, were shopping at a retail store when Nate noticed a newspaper story reporting the murder. Nate knew the victim, so he discussed the story with defendant. Defendant's reaction seemed unusual, making Nate suspicious. In response to Nate's persistent questioning, defendant confessed to the murder, described how he committed it, and showed Nate his firearm.

On 2 July 2004, the day after defendant's confession to him, Nate contacted law enforcement officials who asked him to telephone

defendant and speak with him more about the crimes so that the conversation could be recorded. That evening Nate telephoned defendant. Defendant made incriminating statements that were recorded and subsequently admitted into evidence at trial.

Law enforcement received additional information on 2 July 2004. Francia Lopez, defendant's older half sister with whom defendant and Proctor resided, learned of the victim's death and suspected defendant and Proctor may have been involved. She remembered their arrival at the residence on the evening of the murder carrying bags of groceries and other items. Several days after the murder, Lopez and Proctor traveled in defendant's vehicle to a retail store. Lopez asked Proctor if she and defendant were involved in the murder, and eventually, Proctor admitted the details of the crimes. Worried that defendant would harm anyone he suspected of reporting him to law enforcement, Lopez contacted her cousin in Florida who telephoned members of defendant's and Lopez's extended family. An out-of-state family member informed law enforcement in North Carolina about the details of Proctor's conversation with Lopez. Defendant was arrested the next day, 3 July 2004.

After defendant's arrest, law enforcement received several more pieces of critical evidence. Some of the victim's jewelry and her VCR were discovered at defendant's mother's residence. On 5 July 2004, defendant's mother gave a statement to law enforcement that included the following:

> On Tuesday after they killed that woman they came to my house with the stuff they stole. Ryan had an ATM card he had stolen. Ryan laid a pistol on the table to ask me how he could use the card at a ATM. I told him . . . he couldn't do it without getting caught. . . . I told him to cover his face and his body. . . .
>
> Ryan stole three hats from my boyfriend Luis . . . . Luis recognized the hat from the ATM [photos]. . . . They left to go to ATM and came back around 2:00 to 3:00 a.m.
>
> . . . They had a thousand dollars in a cigarette case. . . . Ryan gave me $160 and said, "If you know what's good for you, don't you say anything."

During the last week of June 2004, defendant visited a friend, Christopher Jamell Joiner, wearing new clothes and jewelry and carrying a new cell phone. Joiner asked defendant how he acquired the

items. Defendant told him, "Don't worry about it." On 2 July 2004, defendant visited Joiner again and gave his firearm to Joiner without explanation. After Joiner learned of defendant's arrest, he wrapped the firearm in a plastic bag and threw it into a wooded area on 4 July 2004. Joiner also contacted friends and members of the victim's family to tell them he had possessed the firearm. When requested, Joiner led law enforcement to the weapon on 6 July 2004 and identified the firearm at trial.

On 8 or 9 July 2004, Francia Lopez retrieved her mail, which at the time was being delivered to her mother's residence. Lopez discovered an envelope addressed to her mother having Rutherford County Jail as the return address. Lopez opened the envelope and found a letter written in defendant's handwriting to their mother. After reading the letter, Lopez turned it over to law enforcement. In the letter, defendant expressed his love for Proctor and for his unborn child. He told his mother he believed he would receive a sentence of death and Proctor would receive a sentence of life imprisonment. Defendant begged his mother to "take the charge for me," so that he and Proctor could be free to marry and raise their child. Defendant unfolded a story his mother was to tell law enforcement if she agreed to help him. In doing so, defendant corroborated evidence from the crime scene and corroborated many of the salient facts testified to by the State's witnesses, including that an "ashtray was right beside" the victim's body when she was killed and "an extension cord" was used to "tie[] her neck to the end of the bed, the post."

Forensic pathologist Donald Jason, M.D., conducted an autopsy on the victim's remains for the State Medical Examiner System. The autopsy revealed numerous bruises and abrasions on the victim's arms, legs, and face. Two sets of ligature grooves were found on the victim's neck, one in the front and another that went all the way around her neck. The marks around the neck were consistent with the testimony received regarding the electrical extension cord defendant wrapped around the victim's neck. The cause of death was strangulation due to either the closing of the victim's airway or the closing of the arteries that carried blood to her brain, or both.

After deliberating on the evidence presented by the State,[3] the jury returned guilty verdicts for first-degree murder, robbery with a dangerous weapon, and conspiracy to commit armed robbery. The trial then advanced to the penalty proceeding as required by statute.

---

3. Defendant presented no evidence during the guilt phase of his trial.

## Penalty Proceeding Evidence

At the penalty proceeding, the State presented certified copies of judgments from Carteret County showing defendant's convictions on 3 September 2002 for common law robbery and second-degree kidnapping. The State also presented victim impact evidence from the victim's brother-in-law, Bob Freeman; the victim's sister, Doris Huntsinger; and the victim's friend and coworker for two and a half years at Goody's Clothing Store, Joannie Davis. Huntsinger testified that she missed her sister every day and stated that she often thought about how her sister was "pleading" for her life but defendant "would not spare it." Davis related that she and the victim enjoyed shopping and eating meals together and that the victim had assisted Davis financially when she attended cosmotology school. Because of "too many memories," Davis quit working at Goody's after the murder.

Defendant presented evidence from various witnesses concerning his background. Defendant's mother, aunt, half sister, sister, and cousin testified concerning defendant's childhood relationship with his father. According to them, defendant's father was a strict disciplinarian who did not allow defendant to show emotion, and he sometimes would strike defendant for "insubordination" or make him do push-ups. They further testified that defendant's father appeared to have little time for defendant after defendant's parents separated and that after defendant was hospitalized for alcohol poisoning when he was seventeen years old, defendant resided with his aunt for about a year. Defendant's aunt could not believe defendant was capable of what he had done. She believed defendant's crimes were a product of his difficult childhood, of his never receiving proper help as a child, and of his relationship with Proctor, who often manipulated defendant. Defendant's mother and cousin also testified that Proctor alienated defendant from his family and that he was at Proctor's "beck and call" whenever she wanted something.

Several witnesses testified to defendant's tendency for outbursts of anger, including a case manager at Rutherford County Mental Health who diagnosed defendant with "intermittent explosiveness disorder" in December 2003. Defendant attended anger management counseling sessions and took medication for a chemical imbalance for a period of time. Nathan Robert Strahl, M.D., a forensic psychiatrist, approximated defendant's emotional age at the time of the crimes to be that of a ten to twelve year old child. Nonetheless,

defendant has never been determined to have a mental illness or to lack the mental capacity to commit a crime.

The jury found three statutory aggravating circumstances: the (e)(3) factor that defendant had been previously convicted of a felony involving the use or threatened use of violence to a person; the (e)(5) factor that defendant committed the murder while engaged in the commission of a robbery; and the (e)(9) factor that the murder was especially heinous, atrocious, or cruel. *See* N.C.G.S. § 15A-2000(e) (2007). One or more jurors found the statutory mitigating circumstance that defendant acted under duress or under the domination of another person. *See id.* § 15A-2000(f)(5) (2007). Additionally, one or more jurors found the existence of eight nonstatutory mitigating circumstances. The jury found the mitigating circumstances were insufficient to outweigh the aggravating circumstances and the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances. The jury then returned a binding recommendation of death, and the trial court entered judgment accordingly.

## ANALYSIS

### Jury Selection Issues

Defendant asserts several assignments of error related to the jury selection process. At the outset, we note that "[o]ur trial courts have traditionally been afforded broad discretion to rule upon the manner and extent of jury voir dire, and this Court will not disturb such a ruling on appeal absent an abuse of that discretion." *State v. Murrell,* 362 N.C. 375, 388-89, 665 S.E.2d 61, 71 (2008) (citation omitted).

> A trial court abuses its discretion if its determination is manifestly unsupported by reason and is so arbitrary that it could not have been the result of a reasoned decision. In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record.

*State v. Cummings,* 361 N.C. 438, 447, 648 S.E.2d 788, 794 (2007) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 128 S. Ct. 1888 (2008). Furthermore, "[t]o obtain relief relating to jury *voir dire,* a defendant must show not only an abuse of discretion, but also prejudice." *State v. Campbell,* 359 N.C. 644, 698-99, 617 S.E.2d 1, 35 (2005) (citation omitted), cert. denied, 547 U.S. 1073 (2006).

**[1]** Defendant first argues the trial court erred in denying his challenge for cause to the twelfth juror seated, Anita Bryant. During voir dire questioning, Ms. Bryant stated she knew defendant's ex-girlfriend and she knew the victim's son, Tommy, through her husband who had met Tommy in high school. She spoke with defendant's ex-girlfriend briefly about defendant's arrest after the crimes took place, but she had not had contact with Tommy for about six years. Additionally, roughly eighteen years ago, Ms. Bryant met the victim when visiting the victim's residence with her husband and Tommy. Ms. Bryant believed she would have an emotional reaction to being involved in the trial, but stated that she could be fair and "would not judge [defendant] before the evidence." Midway through the questioning, defense counsel requested that Ms. Bryant be excused for cause. The State objected, and the trial court denied defendant's request. After additional questioning and more assurances from Ms. Bryant that she would be fair and objective, defense counsel stated, "We're satisfied with this juror." However, defendant renewed his challenge for cause of Ms. Bryant orally and in writing before the jury was impaneled. Again, the State objected to the challenge, and the trial court denied defendant's request. Defendant argues the trial court violated his federal and state constitutional rights by allowing Ms. Bryant to sit on the jury panel. After review, we find defendant has failed to properly preserve this issue.

The procedure defendant was required to follow is established by N.C.G.S. § 15A-1214(h) and (i). Defendant met two of the three requirements of subsection (h) when he exhausted all of his peremptory challenges and had his renewal motion as to Ms. Bryant denied. However, defendant failed to satisfy the remaining requirement under subsection (h): that he renew his challenge as provided in subsection (i). The statutory procedure is mandatory and must be followed precisely. *See State v. Ball*, 344 N.C. 290, 304, 474 S.E.2d 345, 353 (1996), *cert. denied*, 520 U.S. 1180 (1997); *State v. Moseley*, 338 N.C. 1, 27, 449 S.E.2d 412, 428 (1994), *cert. denied*, 514 U.S. 1091 (1995); *State v. Sanders*, 317 N.C. 602, 607-08, 346 S.E.2d 451, 455 (1986). Because defendant failed to preserve this issue for appellate review, this assignment of error is overruled.

**[2]** Second, defendant asserts the trial court erred and violated his federal constitutional rights by excusing three prospective jurors for cause based on their answers to questions concerning the death penalty. On this issue, the Supreme Court of the United States has articulated that the

standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." . . . [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. . . . [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear" . . . . Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . *[T]his is why deference must be paid to the trial judge who sees and hears the juror.*

*Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985) (emphasis added) (footnotes omitted). The test is essentially codified by N.C.G.S. § 15A-1212(8), which provides that a juror may be challenged for cause "on the ground that the juror . . . [a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (2007). As *Wainwright* indicates, the trial court is afforded deference in this matter, and our standard of review is for abuse of discretion. *See State v. Garcia*, 358 N.C. 382, 403-04, 597 S.E.2d 724, 740-41 (2004), *cert. denied*, 543 U.S. 1156 (2005).

After reviewing their entire responses, we observe that each potential juror defendant claims was erroneously excused made statements raising a substantial question regarding in his or her ability to follow the law on the death penalty. We note, for instance, that prospective juror Mr. Park expressed a moral objection to the death penalty and stated he did not believe he could vote "for somebody's life to be taken away." Mr. Park also acknowledged that his feelings would interfere with, or make it extremely difficult for him to consider, the death penalty even if he found the aggravating circumstances outweighed the mitigating circumstances. Prospective juror Mr. Wilson stated several times he had a problem with, or did not believe in, capital punishment on religious and moral grounds. He added that although he believed the death penalty could be appropriate when a child was the victim, to him there was no other situation in which a sentence of death would ever be appropriate. Morever, Mr. Wilson indicated he was not willing to follow the trial court's instructions to even possibly consider the death penalty in the present case. Finally, prospective juror Ms. Wilson stated she believed the death

penalty was warranted in some situations, but she could never vote for that sentence herself because of her religious beliefs. She said she could never vote for the death penalty under any circumstance.

The statements of each of these prospective jurors support our conclusion that the trial court did not abuse its discretion in excusing them for cause. The trial court excused each one only after lengthy questioning from both the prosecution and the defense. The answers from each prospective juror ultimately revealed an unequivocal denial of their personal ability to consider the death penalty in the instant case. As such, the present case is similar to numerous others in which this Court found no abuse of discretion. *See, e.g., State v. Rouse*, 339 N.C. 59, 76, 451 S.E.2d 543, 552 (1994) (noting prospective juror's statement that " 'I don't believe I could vote for the death penalty' "), *cert. denied*, 516 U.S. 832 (1995), *overruled in part on other grounds by State v. Hurst*, 360 N.C. 181, 624 S.E.2d 309, *cert. denied*, 549 U.S. 875 (2006); *State v. Skipper*, 337 N.C. 1, 17-18, 446 S.E.2d 252, 260 (1994) (noting that juror's thoughts and views regarding death penalty seemed conflicting, but evinced a substantial impairment in her ability to follow the law), *cert. denied*, 513 U.S. 1134 (1995), *superseded on other grounds by statute*, N.C.G.S. § 15A-2002, *as recognized in State v. Price*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, 514 U.S. 1021 (1995). The trial court made a rational decision to excuse the prospective jurors in question, and these assignments of error are overruled.

**[3]** Third, defendant claims the trial court erred by sustaining the State's objections to particular voir dire questions. During voir dire, defense counsel attempted to question a prospective juror in the following manner:

> [Defense counsel]: Do you also believe there are instances of first-degree murder—
>
> . . . .
>
> [Defense counsel]: —where life sentence is appropriate.
>
> [Answer]: Yes, if that's what the evidence shows.
>
> [Defense counsel]: Do you have any—well, tell me what you think of that sentence of life in prison without parole. Do you have any views about that?
>
> [Answer]: No.

[Prosecutor]: Well, objection.

THE COURT: Sustained.

[Defense counsel]: [The prosecutor] asked you about your views of the death penalty, did he not?

[Answer]: Yes.

[Defense counsel]: Do you have a feeling whether the death penalty is more or less harsh than life in prison without parole?

[Prosecutor]: Objection.

THE COURT: Sustained.

After this exchange, defense counsel continued questioning the prospective juror without objection for what amounted to several pages of transcript until he was satisfied with her.

Citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), defendant alleges the trial court violated his right to adequately identify unqualified jurors. *Accord State v. Wiley*, 355 N.C. 592, 611-12, 565 S.E.2d 22, 37 (2002) (citing *inter alia, Morgan*), *cert. denied*, 537 U.S. 1117 (2003). Defendant contends his inability to engage in an adequate voir dire impaired his ability to exercise his challenges intelligently, and thus, based on *Wiley*, the trial court's action provides " 'grounds for reversal, irrespective of prejudice.' " *Id.* at 612, 565 S.E.2d at 37 (quoting *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986). In *Wiley*, this Court explained:

[A] defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty. Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion.

*Id.* (citations and internal quotation marks omitted). There are several rational grounds for the trial court's sustaining the objections. In *State v. Neal*, the defendant made similar arguments concerning his ability to question prospective jurors "as to their understanding of the meaning of a sentence of life without parole." 346 N.C. 608, 617, 487 S.E.2d 734, 739 (1997), *cert. denied*, 522 U.S. 1125 (1998). This Court noted that a defendant does not have a " 'constitutional right to question the venire about parole.' " *Id.* at 617, 487 S.E.2d at 740 (quoting

*State v. Spruill*, 338 N.C. 612, 638, 452 S.E.2d 279, 292 (1994), *cert. denied*, 516 U.S. 834 (1995)). To the extent defense counsel's questions were sufficiently covered under *Neal*, they were objectionable and the trial court did not abuse its discretion. Furthermore, defendant is guaranteed that the trial court "shall instruct the jury . . . that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (2007). The trial court in this case followed its responsibilities under Section 15A-2002 by utilizing the proper North Carolina Pattern Jury Instruction. *See* 1 N.C.P.I.— 150.10 (1997).

Additionally, the form of the questions defense counsel posed resemble those this Court analyzed in *State v. Simpson*, 341 N.C. 316, 337, 462 S.E.2d 191, 203 (1995), *cert. denied*, 516 U.S. 1161 (1996). In *Simpson*, this Court concluded that the trial court did not abuse its discretion when sustaining objections to the questions, "Do you think that a sentence to life imprisonment is a sufficiently harsh punishment for someone who has committed cold-blooded, premeditated murder?" and "Do you think that before you would be willing to consider a death sentence for someone who has committed cold-blooded, premeditated murder, that they would have to show you something that justified that sentence?" *Id.* The trial court rationally sustained the objections and did not abuse its discretion. This assignment of error is overruled.

## Guilt-Innocence Phase Issues

### *Evidentiary Issues*

[4] The trial court admitted into evidence the letter defendant wrote to his mother from jail. Defendant assigns error to admission of the letter and contends the State's evidence was so strong as to his involvement in the crime that the letter was: (1) irrelevant to "the only real issue" in the case, namely whether defendant acted with deliberation in committing the murder; (2) a needless presentation of cumulative evidence; and (3) unfairly prejudicial to defendant because of its "repeated references" to the death penalty. Defense counsel objected to the letter's admission under North Carolina Rules of Evidence 401 and 403.

A trial court's decisions on objections based on evidentiary rules 401 and 403 are reviewed for abuse of discretion. *See State v. Chapman*, 359 N.C. 328, 348, 611 S.E.2d 794, 811 (2005) (citing *Garcia*, 358 N.C. at 417, 597 S.E.2d at 749). We find no abuse of discretion here for several reasons. First, it was rational for the trial

court to determine the letter was relevant evidence. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2007). The letter constituted defendant's admission to the crime in his own words; thus, it was relevant to defendant's involvement in the crime and even relevant to defendant's deliberation of the murder, in that defendant's admission to involvement in the crime would have *some tendency* to make his deliberation of the murder more probable. Furthermore, defendant's account of the crime in the letter, although partly fictional, reflected a calculated murder of Mrs. Bennick for her money and goods, without any provocation. As such, the letter had some tendency to make the fact of defendant's real deliberation of the murder more probable.

Second, it was rational for the trial court to determine that admitting the letter did not violate Rule of Evidence 403. The letter was not needlessly cumulative because it was the only piece of evidence originating directly from defendant reflecting his acute memory of significant details from the crime scene. For instance, the letter revealed defendant's recollection that the murder occurred in the rear bedroom, that the victim's body lay facedown with an electrical cord from the living room wrapped around her neck, and that an ashtray laid beside the victim's body.

Additionally, the letter was not *unfairly* prejudicial. "Unfair prejudice, as used in Rule 403, means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *Chapman*, 359 N.C. at 348, 611 S.E.2d at 811 (citations and internal quotation marks omitted). Defendant highlights portions of the letter that may have suggested to the jury that defendant himself agreed the death penalty was the appropriate punishment for his crime. In the letter, defendant pleaded with his mother to take the charge for him. For example, he wrote: "They are saying I am going to get the death penalty and Kaylee is looking at life and my baby is going to get took. Mama, I don't want to die and I don't want Kaylee or my baby to be harmed." Again, he wrote: "Mama, I love you so much, I don't want to die and Kaylee to do life and my baby get took."

Defendant's argument is unpersuasive. The letter was first admitted into evidence during the guilt phase of defendant's trial without any assertion from the prosecution that defendant himself believed he should receive the death penalty. On cross-examination, defense

counsel singled out these exact statements to persuade the jury to note the disparity between Kaylee Proctor's maximum potential sentence of life imprisonment because she was seventeen years old at the time of the crime versus defendant's maximum potential sentence of death because he was eighteen at the time of the crime. The prosecutor referred to the letter in his closing argument during the guilt phase as substantive evidence of defendant's guilt and as corroborative of other testimony the jurors heard. The prosecutor's focus, though, was on the detailed references in the letter to physical evidence of the crime, such as defendant's reference to the side door of the residence, to Old Caroleen Road, to the fence at the back of the property in which two pit bulls were confined, to the electrical extension cord, and to the ashtray beside the victim. In this way, the case *sub judice* is entirely distinguishable from the cases on which defendant relies, such as *State v. Kimbrell*, 320 N.C. 762, 768, 360 S.E.2d 691, 694 (1987). In *Kimbrell*, we held that the trial court committed reversible error in permitting the district attorney, over objection, to ask the defendant repeated questions about devil worship. We observed that these questions were irrelevant to the alleged crimes and that their "real effect . . . [could] only have been to arouse the passion and prejudice of the jury." *Id.* at 768, 360 S.E.2d at 694. Here, defendant's brief dissects statements out of the letter, highlighting their emotional nature; however, doing so misrepresents the overall nature, relevancy, and use of the letter at trial.

Moreover, any emotional impact from the letter might have benefitted defendant. During the sentencing proceeding, the defense called as a witness forensic psychiatrist Nathan Robert Strahl, M.D. Dr. Strahl emphasized the potentially mitigating effect of the letter, as it exhibited "an ultraimmature behavioral aspect" to defendant's personality. Although the letter's impact as substantive evidence of defendant's guilt was unquestionable, its emotional impact could have suggested the nonstatutory mitigator defendant proposed that "at the time of offense" defendant "had developed to the mental/emotional age of only a 10-12 year old child." The prosecutor did not even mention the letter during closing arguments of the sentencing proceeding, while defense counsel emphasized how the letter showed defendant was too young and immature to be held to the ultimate penalty. Defense counsel encouraged the jury to "look into that letter and look, look into the sole [sic] of my client when you do that. Look at where it came from. Study the significance." Defendant has little ground to complain on appeal regarding the letter's effect when

defense counsel at trial asked the jury to "study [its] significance" as supportive of defendant's mitigating evidence.

The letter did not constitute needless cumulative evidence, nor was it unfairly prejudicial to defendant. It was rational for the trial court to conclude the letter was relevant and did not run afoul of Rule 403. Defendant's assignments of error are overruled.

**[5]** Next, defendant claims the trial court committed plain error by allowing Quntia Davis' testimony concerning an extrajudicial question regarding how many people defendant had killed. During direct examination, Quntia recounted a conversation after defendant murdered Mrs. Bennick and returned to his vehicle:

Q: What did [defendant] say?

A: He said, "I killed her. I choked her out."    .

Q: Didn't tell you anything else?

A: No, sir. And Jerome had asked—was trying to ask Ryan how many people did he kill. And Ryan—*Kaylee was about to tell Jerome*, and Ryan said, "Don't be telling my business."

Q: Okay. Now, you stayed with Ryan for a day or two at least after this killing took place; is that right? .

A: Yes, sir.

(Emphasis added.) Defense counsel did not object to this testimony; thus, our review is for plain error. N.C. R. App. P. 10(c)(4). Plain error analysis applies to evidentiary matters and jury instructions. *See, e.g., Cummings*, 361 N.C. at 469, 648 S.E.2d at 807 (citations omitted). " 'A reversal for plain error is only appropriate in the most exceptional cases.' " *State v. Raines*, 362 N.C. 1, 16, 653 S.E.2d 126, 136 (2007) (citation omitted). The plain error rule is critical in the context of admitting physical evidence or testimony without an objection because the trial court is not expected to second-guess a party's trial strategy. The possibility always exists that a party intentionally declines to object for some strategic reason. *State v. Black*, 308 N.C. 736, 740, 303 S.E.2d 804, 806 (1983). To show plain error, " ' "defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result," ' " *State v. Allen*, 360 N.C. 297, 310, 626 S.E.2d 271, 282, *cert. denied*, 549 U.S. 867 (2006) (quoting, *inter alia, State v. Haselden*, 357 N.C. 1, 13, 577 S.E.2d 594, 602, *cert. denied*, 540 U.S. 988 (2003));

or we must be convinced that any error was so "fundamental" that it caused "a miscarriage of justice," *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations and quotation marks omitted).

Jerome's question, as recorded in Quntia's testimony, was not speculation because it was merely a question. It was speculation, though, for Quntia to testify that Kaylee was about to tell Jerome how many people defendant had killed. Testimony that is mere speculation is inadmissible. *See* N.C.G.S. § 8C-1, Rule 602 (2007) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.") However, there was no apparent hearsay in this section of Quntia's testimony because nothing was offered to prove the truth of a matter asserted. *See id.* Rule 801(c) (2007).

Defendant acknowledges the comment was brief, and the prosecutor immediately moved on to a different line of questioning. Moreover, nowhere else in nearly 1,400 pages of transcript does the question of defendant's prior involvement in any other killings arise, and defendant points to nothing else to indicate the jury inferred defendant had been involved in killing other individuals. Concluding that absent this statement the jury probably would have found defendant not guilty, or that admitting this testimony as evidence was error so fundamental it constituted a miscarriage of justice, is simply untenable as the substantive evidence of defendant's guilt is overwhelming. These assignments of error are overruled.

[6] Defendant next assigns error to the trial court's admission of portions of testimony from defendant's sister, Francia Lopez, and Lopez's boyfriend, Angel Akers. Defendant contends their testimony concerning defendant's violent acts and their fear of defendant after the crimes occurred was irrelevant and unfairly prejudicial and constituted improper character evidence. Because defense counsel did not object to this testimony, our review is for plain error. *See, e.g.*, N.C. R. App. P. 10(c)(4); *Cummings*, 361 N.C. at 469, 648 S.E.2d at 807.

Lopez, Akers, and their four year old daughter resided at the same location with defendant and Proctor at the time of the crimes. Lopez and Akers witnessed defendant's behavior and interactions with Proctor after the crimes. Both Lopez and Akers attested to Lopez's fear of defendant and of what he might do if she contacted law enforcement. For instance, Lopez was asked, "But you were scared of Ryan?" and she answered, "Yeah, I don't deny I was scared. Anybody would be after finding out someone murdered somebody.

It's scary." Additionally, defendant challenges the admission of Akers' testimony regarding an incident between defendant and Proctor one evening after the crimes. Defendant believed Proctor had undercooked his meat for a meal and thought perhaps Proctor was trying to poison him. Akers' testified as follows in response to the prosecutor's questions:

Q. Okay. Let me ask you about this time that you're talking about things being tense there in the trailer. . . .

A. Yeah. . . .

Q. What did Ryan do?

A. He had—he was pretty upset. He went in his room, Kaylee was sitting on the bed. He had took his gun and he pointed it at her. He said—

. . . .

Q. . . . What did he do with this gun?

A. I don't know if he cocked it, but I know he just pointed it at her and said, "Give me ten bucks, I will shoot her." But he was laughing. And man, I was like, "Man, put that down." I was kind of nervous because I mean, he was drinking. And I don't trust anybody sober with a gun, let alone being drunk.

Q. Did you tell him you weren't going to let him shoot—

A. Yeah.

Q. —anybody?

A. I told him, I said "I can't let you do that, man."

Q. What happened after that?

A. Stuff had calmed down for a little bit. And then like I heard Kaylee make a cough sound. He went—I went in there and Ryan had Kaylee down on the bed and he had his hands on her chest or her neck, I don't know, and I went over there and got him off. And he ended up going to sleep shortly after that.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. The fear Lopez and Akers expressed was natural and understandable in light of Proctor's confes-

sion to Lopez that defendant and she were involved in the crimes. Fear was a product of their belief in defendant's guilt at the time, and it explained why Lopez did not contact law enforcement directly or more immediately after Proctor's confession to her. As such, testimony of their fear had some tendency as circumstantial evidence to make the existence of defendant's guilt more probable. Similarly, Akers' testimony of the incident between defendant and Proctor was relevant because it exhibited the tension and stress defendant and Proctor displayed after committing the crimes. The prosecutor's line of questioning sought to uncover whether defendant or Proctor or both exhibited any unusual behavior after the date of the crimes. Defendant's clearly outlandish response to an undercooked meal could have indicated nervousness, stress, or tension due to his suffering under the burden of committing the crimes. Further, the incident was relevant because it bore on defendant's relationship with Proctor, which was central to the defense's theory of the case at trial that Proctor could manipulate defendant into doing anything. The weight of this evidence was for the jury to determine.

We are satisfied the evidence was admissible because of its relevance as explained above, and accordingly, it was not offered as mere character evidence "for the purpose of proving that [defendant] acted in conformity therewith on a particular occasion." *Id.* Rule 404 (2007); *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54 (1990) (explaining that relevant evidence of acts by a defendant is inadmissible "if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged"). The essence of the State's argument was not that defendant was a violent person; therefore, he must have acted violently toward Mrs. Bennick and murdered her. Rule of Evidence 404 was not violated.

The question still remains, however, whether the evidence was so unfairly prejudicial that the trial court committed plain error in admitting it. "Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree." *State v. Weathers*, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994). Here, even assuming *arguendo* that the evidence was prejudicial, we cannot conclude the danger of unfair prejudice *substantially* outweighed the evidence's probative value, *see* N.C.G.S. § 8C-1, Rule 403 (2007), nor can we conclude that absent its admission the jury would have probably found defendant not guilty of first-degree murder or that its admission caused a miscarriage of justice. The trial

court did not commit plain error by allowing the testimony. Defendant's assignments of error are overruled.

[7] Next, defendant assigns error to the trial court's admitting into evidence extrajudicial statements from State witnesses Anthony, Quntia, and Jerome Davis. On 5 July 2004, Anthony, Quntia, and Jerome voluntarily went to the Rutherford County Sheriff's Department and individually spoke with different law enforcement officers. The State proffered the testimony of each of the officers recounting their interviews. Defense counsel objected to the officer's account of Anthony's interview on the grounds that Anthony was not given *Miranda* warnings and statements in the interview went beyond Anthony's trial testimony and thus were not properly corroborative. Defense counsel also objected prior to the testimony recounting the interviews of Quntia and Jerome and requested limiting instructions for the jury. The trial court overruled each objection and informed the jurors at length that they could consider statements made during the interviews only for corroboration purposes when they weighed the credibility of the Davises' trial testimony. The trial court also properly explained: "[A]ny statement made prior to this trial not under oath cannot be used as evidence of anything that the State is complaining of or as substantive evidence of anything that occurred or didn't occur." The trial court then allowed each officer to testify from their notes taken at the interviews.

Defendant develops a host of arguments in his brief alleging error on hearsay and constitutional grounds and alleging plain error. We note that defendant makes arguments before us that were not grounds for objection at trial, and defendant identifies as prejudicial specific statements from the interviews that were not specifically objected to at trial. As such, we conclude that defendant's arguments are not properly preserved for appeal; however, we choose to review the alleged errors for plain error. N.C. R. App. P. 2.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c). The testimony at issue was not hearsay because it was offered as corroboration evidence and not substantive evidence. " 'Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness.' " *State v. Harrison*, 328 N.C. 678, 681, 403 S.E.2d 301, 303 (1991) (quoting *State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980)). Deciding whether to receive or exclude corroborative testimony, " 'so

as to keep its scope and volume within reasonable bounds, is neces-
sarily a matter which rests in large measure in the discretion of the
trial court.'" *State v. Henley*, 296 N.C. 547, 551, 251 S.E.2d 463, 466
(1979) (quoting *Gibson v. Whitton*, 239 N.C. 11, 17, 79 S.E.2d 196, 201
(1953)). This Court has held that

> "prior statements of a witness can be admitted as corroborative
> evidence if they tend to add weight or credibility to the witness'
> trial testimony. New information contained within the witness'
> prior statement, but not referred to in his trial testimony, may
> also be admitted as corroborative evidence if it tends to add
> weight or credibility to that testimony."

*State v. Davis*, 349 N.C. 1, 28, 506 S.E.2d 455, 469-70 (1998) (citations
omitted), *cert. denied*, 526 U.S. 1161 (1999). "[I]f the testimony
offered in corroboration is generally consistent with the witness's tes-
timony, slight variations will not render it inadmissible. Such varia-
tions affect only the credibility of the evidence which is always for
the jury." *State v. Warren*, 289 N.C. 551, 557, 223 S.E.2d 317, 321
(1976) (citations omitted).

Here, the testimony recounting the interviews contains
slightly varied or slightly new information compared with the trial
testimony of Anthony, Quntia, and Jerome Davis. The case *sub judice*
is dissimilar to *State v. Warren*, in which proffered corroborative
testimony directly contradicted a witness's trial testimony. *Id.* at
556-57, 223 S.E.2d at 320-21; *see also State v. McDowell*, 329 N.C. 363,
384, 407 S.E.2d 200, 212 (1991) (explaining "the State cannot intro-
duce prior statements which 'actually directly contradicted . . . sworn
testimony'" (quoting *State v. Burton*, 322 N.C. 447, 451, 368 S.E.2d
630, 632 (1988) (alteration in original))). After reviewing the record,
we cannot conclude that admitting the testimony constituted error,
plain or otherwise, because the trial court properly instructed the
jury at length to only consider the testimony for corroboration pur-
poses. Furthermore, the testimony recounting the interviews
reflected that "the narration of events [was] substantially similar to
the witness' in-court testimony," and the weight of the Davises' in-
court testimony was strengthened. *State v. Williamson*, 333 N.C. 128,
136, 423 S.E.2d 766, 770 (1992) (citations omitted). Accordingly,
defendant's assignments of error are overruled.

[8] Defendant next assigns error to the trial court's failure to se-
quester certain witnesses, which led to at least one witness's testify-
ing based on exposure to prior testimony. Citing due process con-

STATE v. GARCELL

[363 N.C. 10 (2009)]

cerns, defendant moved before trial pursuant to N.C.G.S. § 15A-1225 that witnesses be sequestered. The motion was granted only as to the three testifying codefendants, Anthony, Quntia, and Jerome Davis. During the trial, Nathaniel Whiteside testified on direct examination that defendant told him that after tying the victim to the bedpost, defendant rode the victim like a horse and said, "Giddy up, giddy up." On cross-examination, Whiteside admitted that defendant had not described riding the victim like a horse to him personally, and Whiteside acknowledged he had heard that detail for the first time in the courtroom that day. Earlier in the day that Whiteside testified, a law enforcement officer read to the jury as corroboration evidence an account of his interview with Anthony Davis on 5 July 2004. Anthony's extrajudicial statement from 5 July 2004 contained a reference to defendant's riding the victim like a horse while saying, "Giddy up, horsey, giddy up."

A trial court's ruling on a motion to sequester witnesses pursuant to N.C.G.S. § 15A-1225 "rests within the sound discretion of the trial court, and the court's denial of the motion will not be disturbed in the absence of a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Anthony*, 354 N.C. 372, 396, 555 S.E.2d 557, 575 (2001) (citations and quotation marks omitted), *cert. denied*, 536 U.S. 930 (2002). Despite citing due process concerns to the trial court, defendant fails to adequately develop a constitutional claim on appeal and has thus abandoned any such argument. N.C. R. App. P. 28(a), (b)(6).

After reviewing the record, it is apparent the trial court gave defendant's motion "thoughtful consideration." *Anthony*, 354 N.C. at 396, 555 S.E.2d at 575 (citation omitted). While defendant requested all witnesses be sequestered, he particularly took issue with the four codefendants to the crimes and noted that three were expected to testify (referring to Anthony, Quntia, and Jerome Davis). For reasons of efficiency, the trial court chose not to sequester all witnesses, but agreed to sequester the testifying codefendants.

Defendant unsuccessfully attempts to distinguish this case from prior cases in which this Court found no abuse of discretion when examining a trial court's refusal to sequester witnesses. For instance, in *State v. Anthony*, this Court found no abuse of discretion and noted that defendant pointed to no instance "in the record where a witness conformed his or her testimony to that of another witness." *Id.* at 396, 555 S.E.2d at 575. Defendant argues here that a witness for the State clearly conformed his testimony to that of another witness.

Defendant's argument, however, ignores that when dealing with this issue in *Anthony,* this Court also noted how the defendant in his motion "gave no specific reason to suspect that the State's witnesses would tailor their testimony to fit within a general consensus." *Id.* Here, defendant only raised a specific concern regarding the ability of the codefendants to hear one another's testimony. Accordingly, the trial court made a rational decision to sequester the codefendants. Beyond that, the trial court had little, if any, reason to conclude the sequestering of all witnesses was beneficial to the administration of justice. The trial court made a reasoned decision, and the assignment of error is overruled.

### Closing Argument Issues

[9] Defendant argues the trial court erred by failing to intervene *ex mero motu* during the guilt-innocence phase closing arguments when the prosecutor stated: "Kaylee Proctor was talking about [the alleged crimes]. *Probably was not proud of what had happened, probably was scared to death.* That's why she went to Francia [Lopez] and told her about it." (Emphasis added.) Defendant argues these statements have no basis in the evidence presented and were grossly improper because they were designed to rebut the central theme of the defense that Proctor was cold, selfish, and manipulative, and defendant could not have "truly deliberated" Mrs. Bennick's killing.

Defense counsel did not object to the statements; thus, under our standard of review, we will not conclude the trial court erred by not intervening "unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair." *Allen,* 360 N.C. at 306-07, 626 S.E.2d at 280 (citation omitted). Trial counsel is granted " 'wide latitude' " during arguments to the jury. *Id.* at 306, 626 S.E.2d at 280 (citation omitted). "Counsel may argue any facts in the record and any reasonable inference that may be drawn from any facts in the record." *Id.* (citation omitted).

An examination of the record shows that the prosecutor made this comment in the broader context of describing how defendant was apprehended by law enforcement. Defendant was ultimately apprehended partly because he confessed to the murder and partly because Proctor spoke with Lopez about the crimes. The comment regarding Proctor's emotional state and motive for speaking with Lopez was brief, and it appears the statement would have had little bearing on the jury's ultimate determination of defendant's guilt. The comment in no way rose to the character of impermissible forms of

closing arguments delineated by the General Assembly. *See* N.C.G.S. § 15A-1230(a) (2007).

Furthermore, Angel Akers, Lopez's boyfriend at the time, testified to how "tense" the situation was after 22 June 2004 at the residence he shared with Lopez, defendant, and Proctor. Akers testified that defendant was "kind of touchy" and more easily angered. Akers described the violent incident between defendant and Proctor the evening defendant believed Proctor tried to poison him by undercooking his meal. As already discussed above, defendant and Proctor argued with each other, and defendant pointed his firearm at Proctor, stating, "Give me ten bucks, I will shoot her." The situation defused a bit, but after hearing Proctor make a coughing sound, Akers discovered defendant hovering over Proctor on their bed with his hands on her chest or neck. Akers physically restrained defendant. Based on Akers' testimony, it is not unreasonable to suggest that Proctor was "probably [] scared to death" during the last week of June 2004 after the commission of the murder, regardless of her participation in the crimes.

The prosecutor's comment was brief and was not an unreasonable inference in light of Akers' testimony. Accordingly, we determine the prosecutor's comments were not "so grossly improper [as to] render[] the trial and conviction fundamentally unfair." *Allen,* 360 N.C. at 306-07, 626 S.E.2d at 280. This assignment of error is overruled.

### *Jury Issues*

[10] Defendant assigns error to the trial court's failure to inquire why jurors requested to be referred to by individual juror numbers the day after they returned verdicts of guilty and were polled by name. Immediately before the beginning of the sentencing proceeding, the trial court explained:

> The jurors sent a note to the Court by way of the bailiff stating that they want the Court to please call the jurors by number instead of name. It was very upsetting to some of the jurors to be named, I assume, when they were polled. So if and when that becomes an issue again, I will address it then.

Knowing of the jurors' request, defendant argues the trial court was obligated to inquire whether the jurors were able to proceed in a fair and impartial manner because the request may have resulted from an improper exposure to some external influence. The absence of a fair and impartial jury would, of course, violate multiple constitutional

guarantees afforded to defendant. *See, e.g., State v. Chandler*, 324 N.C. 172, 185-86, 376 S.E.2d 728, 737 (1989) ("Both defendant and the State are entitled to a fair trial and a fair trial requires an impartial jury."); *see also* U.S. Const. amend. VI; N.C. Const. art. I, § 24.

Initially, we note that "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982) (citations omitted). Defense counsel did not object or make a motion for a mistrial pursuant to N.C.G.S. § 15A-1061 on this point. Despite the lack of an objection, we address this assignment of error in the interest of preventing any manifest injustice. N.C. R. App. P. 2.

In general, the trial court "possesses broad discretionary powers" to conduct a fair and just trial. *State v. Britt*, 285 N.C. 256, 272, 204 S.E.2d 817, 828 (1974) (citations omitted). "When there is a *substantial* reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial." *State v. Barts*, 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986) (emphasis added) (citations omitted). When error is alleged in this manner, it is typically because the possibility of some type of improper external contact involving a juror or jurors is brought to the trial court's attention. *See, e.g., Hurst*, 360 N.C. at 186-87, 624 S.E.2d at 315-16 (in which a prospective alternate juror stated during *voir dire* he had read a newspaper article concerning the case in the jury room); *State v. Willis*, 332 N.C. 151, 172, 420 S.E.2d 158, 168 (1992) (in which the trial court learned " 'one of the family members of one of the parties may have talked to one of the jurors' "). "An inquiry into possible [juror] misconduct is generally required only where there are reports indicating that some prejudicial conduct has taken place." *State v. Barnes*, 345 N.C. 184, 226, 481 S.E.2d 44, 67 (1997) (citing *State v. Harrington*, 335 N.C. 105, 115, 436 S.E.2d 235, 240-41 (1993)) (defense counsel alleged but showed nothing to substantiate the claim that a juror telephoned a minister to ask questions about the death penalty), *cert. denied*, 523 U.S. 1024 (1998). "The trial court retains sound discretion over the scope of any such inquiry." *State v. Murillo*, 349 N.C. 573, 599, 509 S.E.2d 752, 767 (1998) (citing *Willis*, 332 N.C. at 173, 420 S.E.2d at 168), *cert. denied*, 528 U.S. 838 (1999).

Here, although there were no reports that any improper or prejudicial matters reached the jurors, defendant speculates two events

possibly influenced them. First, after the jury returned verdicts of guilty on all charges, the transcript reflects that a commotion occurred in the courtroom because defendant's mother suffered a seizure. The trial court observed the need for medical assistance and asked the members of the jury to leave the courtroom. Jurors returned after defendant's mother received medical care, and they were then polled by name concerning the verdicts. Second, on that same day, after the jury was excused for the day, the transcript reflects that defendant "attacked" a law enforcement officer in the courtroom "and was subsequently handcuffed." The jury members requested to be referred to by number the next morning.

In the end, defendant's argument is based on pure speculation. Any number of reasons could have motivated jurors' request for anonymity, and defendant acknowledges that ultimately the jurors' concern was unspecified and unknown. Without the trial court's receiving any information other than the bare request from the jury, we cannot say the trial court had a substantial reason to question jurors as to whether they had been exposed to improper and prejudicial matters. Moreover, the trial judge was present when defendant's mother suffered the seizure, and he was in the best position to determine that the incident did not prejudicially influence the jury. *See State v. Turner,* 330 N.C. 249, 263-66, 410 S.E.2d 847, 855-57 (1991). A request from the jury to be referred to by number and not by name is neither a de facto indicator that the jury has been improperly exposed to an external influence nor a de facto indicator of prejudice against defendant. This assignment of error is overruled.

## Penalty Proceeding Issues

### *Jury Instruction Issues*

At the beginning of the penalty proceeding, the trial court admitted into evidence as exhibits for the State certified copies of judgments from the Superior Court of Carteret County showing defendant was convicted by guilty pleas of one count of common law robbery and two counts of second-degree kidnapping on 3 September 2002. The State did not introduce any further evidence describing the facts surrounding the convictions. Defense witness, forensic psychiatrist Dr. Strahl, commented that the kidnappings occurred "where [defendant] broke into a flea market and there was an armed robbery." Additionally, while discussing the proposed jury instructions on mitigating circumstances, defense counsel explained to the trial court that the common law robbery and two counts of second-degree kid-

napping occurred as "one event. But there were . . . three charges that grew out of it . . . . [I]t [is] all one set of charges that occurred at one time on one day."

**[11]** The trial court instructed jurors they could consider the common law robbery conviction or second-degree kidnapping convictions or both as support for finding the (e)(3) aggravating circumstance that "defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). Defendant contends the trial court violated his federal and state constitutional rights and committed plain error by submitting the second-degree kidnapping convictions to the jury because second-degree kidnapping does not by definition involve the use or threat of violence to the person.[4]

Because defense counsel declined to object at trial to submission of the kidnapping convictions to the jury, we review whether the trial court committed plain error.[5] N.C. R. App. P. 10(c)(4). After reviewing the record, we cannot conclude the trial court committed plain error in this instance. "The (e)(3) prior violent felony aggravating circumstance requires proof that the defendant was convicted of either a felony in which the use or threat of violence to the person is an element of the crime or a felony which actually involved the use or threat of violence." *State v. Flowers*, 347 N.C. 1, 34, 489 S.E.2d 391, 410 (1997) (citing *State v. McDougall*, 308 N.C. 1, 18, 301 S.E.2d 308, 319, *cert. denied*, 464 U.S. 865 (1983)), *cert. denied*, 522 U.S. 1135 (1998). Both parties agree this Court has never squarely ruled that second-degree kidnapping is an inherently violent offense despite the argument that kidnapping always involves at least the implicit use or threatened use of violence.[6] Despite the well-reasoned

---

4. Defendant concedes that by definition the crime of common law robbery involves the use, or threatened use, of violence. *See State v. Jones*, 339 N.C. 114, 164, 451 S.E.2d 826, 854 (1994), *cert. denied*, 515 U.S. 1169 (1995). As such, these assignments of error only relate to the kidnapping convictions.

5. Defense counsel not only declined to object when the State offered the judgments, but commented: "I think they are admissible for this purpose."

6. In *State v. Campbell*, this Court was presented with the issue of whether kidnapping was an inherently violent offense, but declined to answer that question. 359 N.C. at 685, 617 S.E.2d at 26-27. Instead, the Court held the trial court did not abuse its discretion by allowing the State to present evidence of the circumstances surrounding the defendant's previous conviction for second-degree kidnapping. *Id.* The defendant's argument in *Campbell* was the opposite of the one made in the present case: in *Campbell*, the defendant asserted that kidnapping is inherently violent and that the State's "introduction of the conviction [alone] was sufficient to satisfy the State's burden of proof." *Id.* Previously, this Court came close to acknowledging the inherent vio-

conclusions of federal courts[7] and despite the State's urging us to do so, we need not hold today that second-degree kidnapping is an inherently violent offense.

"[I]t is well established that two or more criminal offenses may grow out of the same course of action . . . ." *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). The two judgments introduced into evidence by the State informed the jury that defendant committed the common law robbery and kidnappings as separate and complete acts, independent of each other. *See State v. Smith*, 359 N.C. 199, 213-14, 607 S.E.2d 607, 618-19, *cert. denied*, 546 U.S. 850 (2005). However, the jury also heard Dr. Strahl tie the crimes together as transpiring during the same course of events. Additionally, at trial defense counsel explained to the court that all of the crimes were in essence "one event." At oral argument before this Court, counsel for defendant acknowledged that the purpose of the restraint defendant perpetrated during the kidnappings was to facilitate the commission of the common law robbery. *See* N.C.G.S. § 14-39(a)(2) (2007). It is entirely logical to view the two counts of second-degree kidnapping as involving an *inherent* use or threat of violence when committed in the same course of action as the inherently violent crime of common law robbery. Defendant asserts that fraud is a nonviolent, legally cognizable means of committing a kidnapping, *see, e.g., Fulcher*, 294 N.C. at 523, 243 S.E.2d at 351; however, in light of the robbery conviction and the comments of Dr. Strahl and defense counsel that tied the crimes together, it is untenable in this situation to maintain that the trial court committed plain error by submitting the kidnapping convictions in support of the (e)(3) aggravating circumstance.

Even assuming *arguendo* it was error to submit the kidnapping convictions, for several reasons we are convinced that any possible error was harmless beyond a reasonable doubt and not unduly prejudicial to defendant's case. *See* N.C.G.S. § 15A-1443(b) (2007); *Odom,*

---

lence in kidnapping by noting in *State v. Tucker* that every kidnapping exposes the victim to an inherent degree of danger. 317 N.C. 532, 535-36, 346 S.E.2d 417, 419-20 (1986).

7. *See, e.g., United States v. Williams*, 110 F.3d 50, 53 (9th Cir.) (holding that "kidnapping which occurs 'without consent' of the victim . . . involves an inherent risk of physical injury" under U.S. Sentencing Guidelines), *cert. denied*, 522 U.S. 856 (1997); *United States v. Kaplansky*, 42 F.3d 320, 324 (6th Cir. 1994) (noting that even when "deception may be used to effect [a] kidnapping [that] does not erase the ever-present possibility that the victim may figure out what's really going on and decide to resist, in turn requiring the perpetrator to resort to actual physical restraint if he is to carry out the criminal plan. Thus, the potential for violence against the victim is an inherent aspect of the crime of kidnapping . . . .").

307 N.C. at 660, 300 S.E.2d at 378. First, because common law robbery involves an inherent element of violence, defendant's conviction for common law robbery was sufficient alone for the jury to find the existence of the (e)(3) aggravator. *See State v. Jones*, 339 N.C. 114, 164, 451 S.E.2d 826, 854. Indeed, during the State's closing argument at the end of the penalty proceeding, the prosecutor did not even mention defendant's convictions for second-degree kidnapping, but argued for the existence of the (e)(3) aggravating circumstance solely on the basis of defendant's prior conviction for common law robbery. The prosecutor was very succinct and straightforward in stating that common law robbery by definition involves "the use or threat of violence." Thus, had the trial court not submitted the kidnapping convictions to the jury, we cannot find a "reasonable possibility that . . . the jury would have reached a different result and rejected the existence of the (e)(3) aggravating circumstance." *See Flowers*, 347 N.C. at 31, 489 S.E.2d at 408. Similarly, there is no reasonable possibility the jury would have returned a different sentencing recommendation had the kidnapping convictions not been submitted to the jury. Besides (e)(3), the jury also found the (e)(5) and (e)(9) aggravators, and unlike *State v. Robbins*, in which the jury seemed to have "difficulty" recommending death, 319 N.C. 465, 516, 356 S.E.2d 279, 309, *cert. denied*, 484 U.S. 918 (1987), the jury here deliberated on defendant's punishment for approximately two and one-half hours. Any possible error in submitting the kidnapping convictions was harmless beyond a reasonable doubt and did not unfairly tip the scales of justice toward the death penalty. These assignments of error are overruled.

[12] As separate and distinct assignments of error relating to the submission of the convictions for kidnapping to the jury, defendant contends the trial court's instruction to the jury included theories of guilt that were wholly unsupported by any evidence. Defense counsel did not object to this issue at trial; therefore, we limit our review to plain error. N.C. R. App. P. 10(c)(4). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997) (citation omitted), *cert. denied*, 522 U.S. 1126 (1998).

In the trial court's charge to the jury during the penalty proceeding, it instructed that

[s]econd degree kidnapping is the unlawful confining and/or restraining and/or removal of a person from one place to another

without that person's consent, or if under 16 without the consent of the parent or guardian, for the purpose of holding that person for hostage or ransom or using that person as a shield or terrorizing that person from [sic] any other purpose.

Although not verbatim, this partial definition of second-degree kidnapping is based on N.C.G.S. § 14-39(a). The parties did not request, and the trial court did not utilize, the pattern jury instruction established for the (e)(3) aggravating circumstance. *See* 1 N.C.P.I.—Crim. 150.10. Use of the pattern instructions is encouraged, but is not required. *State v. Morgan*, 359 N.C. 131, 169, 604 S.E.2d 886, 909 (2004), *cert. denied*, 546 U.S. 830 (2005).

Just as we could not find plain error in the submission of the kidnapping convictions to the jury, we fail to find plain error in the trial court's jury instructions here. In spite of the less than exemplary definition of second-degree kidnapping provided in this case, numerous factors prevent us from concluding defendant suffered a manifest injustice or that the jury probably would have reached a different result had a more laudable instruction been given. The trial court's partial description of second-degree kidnapping was a correct statement of the law and was only a definition, not a peremptory instruction that defendant had in fact acted in any manner reflected therein. Further, in light of its inherent element of violence, submitting the common law robbery conviction alone was sufficient to support the (e)(3) aggravator, and that was the sole focus of the prosecutor during his closing argument when asking the jury to find that aggravating circumstance. Finally, the jury found two other aggravating circumstances in addition to the (e)(3) aggravator to weigh against the mitigating circumstances, and jurors deliberated for approximately two and one-half hours before recommending death.

No reasonable possibility exists that the jury's recommendation would have been different had no error occurred, and the instruction was not so unduly prejudicial as to lead us to conclude that justice was not done. Further, any possible error was harmless beyond a reasonable doubt. These assignments of error are overruled.

## Motion for Appropriate Relief

[13] Pursuant to N.C.G.S. §§ 15A-1411, -1415, -1418, and -1420, defendant filed a motion for appropriate relief (MAR) in this Court the same day he filed his brief with this Court. With his MAR, defendant

attached materials related to his prior convictions for second-degree kidnapping and the affidavit of one of his trial attorneys. After careful review, we conclude the merits of this motion may be determined on the basis of the materials before us. *See* N.C.G.S. § 15A-1418(b) (2007).

In his MAR, defendant argues two points. First, he expands on the issue just addressed above and claims that not only did the trial court's jury instructions list theories of guilt of second-degree kidnapping that were wholly unsupported by the evidence, but that the theories of guilt listed are contradicted by record evidence of what actually occurred. Second, defendant claims in his MAR he was afforded ineffective assistance of counsel on two occasions: (1) when counsel failed to object to submission of the (e)(3) aggravator on the grounds that second-degree kidnapping is not a violent crime by definition and the State presented insufficient evidence that these kidnappings included the use or threatened use of violence; and (2) when counsel failed to object to the trial court's including in the jury instruction for the (e)(3) aggravator a definition of kidnapping based on theories of guilt contradicted by record evidence. Defendant asserts these errors violated his rights under both the federal and state constitutions. For the reasons stated below, defendant's MAR is denied.

Regarding defendant's first argument, part of the trial court's instruction defining second-degree kidnapping described the crime as "the unlawful confining and/or restraining and/or removal of a person . . . under 16 without the consent of the parent or guardian, for the purpose of holding that person for hostage or ransom or using that person as a shield or terrorizing that person from [sic] any other purpose." Through a police report and the facts stipulated at the plea hearing, defendant recounts the details of the actual crimes committed on 24 January 2002 in his MAR. Defendant relates how he and a companion entered a business at the Indoor Outdoor Flea Mart in Newport, North Carolina, and ordered two women working behind the store counter to lie down on the ground. Defendant placed the barrel of his firearm on the neck of one of the women to make her lie down so the robbery could be carried out. Both women lay on the floor, begging for their lives. Defendant and his companion left the store with approximately eighty-one dollars, but were arrested shortly thereafter. Defendant stresses that, according to the factual basis for his guilty pleas, one woman at the flea market was sixty-three years old and the other was fifty years old at the time, meaning

neither was under sixteen. Further, defendant stresses that the kidnappings were for the purpose of facilitating a felony, robbery with a dangerous weapon, and not for holding the women "for hostage or ransom or using [them] as a shield or terrorizing" them.

Defendant's argument misses the mark. As noted above, the instruction simply contained a partial definition based on N.C.G.S. § 14-39(a) that was a correct statement of the law and was not a peremptory instruction on any specific acts defendant had in fact committed. In light of the common law robbery conviction and its inherent element of violence, we are convinced the instruction did not tilt the scales of justice against defendant and constitute plain error because the jury would have come to the same result regardless of any error. *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986) (citation omitted). Moreover, defendant's argument is a bit puzzling in light of the actual facts as submitted by him. The image of defendant placing the barrel of a firearm on the neck of a middle-aged female store clerk and ordering her to lie on the floor while she begs for her life so the robbery can be carried out leaves little, if any, doubt that violence or the threat of violence was used during the commission of these crimes. Even if it was erroneous, the instruction in question was harmless beyond a reasonable doubt and cannot be viewed as constituting plain error.

Defendant also asserts in his MAR that he was denied effective assistance of counsel when no objections were made to submission of the kidnapping convictions to the jury or to the jury instruction regarding those convictions. This argument is without merit. The components necessary to show ineffective assistance of counsel are (1) "counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense," meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)); *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985) ("expressly adopt[ing] the test set out in *Strickland v. Washington* as a uniform standard to be applied to measure ineffective assistance of counsel under the North Carolina Constitution").

Defendant's trial counsel states in an affidavit attached to the MAR that he did not object to submission of the kidnapping convictions because he did not consider the possibility that second-degree kidnapping could be committed without inherently involving the use

or threat of violence. He did not object to the jury instruction in question because he did not focus on those parts of the instruction defendant now claims contain error and because it did not occur to him that the instruction might have been prejudicial to defendant's case. As well, he states he did not have any strategic reasons for not objecting to either item.

The performance of defense counsel did not sink to the level of that described in *Rompilla v. Beard*, 545 U.S. 374 (2005), which defendant cites as support. In *Rompilla*, the Commonwealth of Pennsylvania sought the death penalty against the defendant and planned to introduce the defendant's prior convictions for rape and assault at the postconviction evidentiary hearing to support an aggravating circumstance. *Id.* at 377-78, 383. Despite defense counsel's knowledge of the Commonwealth's intentions, she failed to even examine the defendant's prior conviction file. *Id.* at 383-85. Counsel's failure to examine the "readily available file . . . seriously compromis[ed] [the defendant's] opportunity to respond to a case for aggravation," *id.* at 385, and "fell below the level of reasonable performance," *id.* at 383.

Here, defendant's trial counsel states he had reviewed the evidence from defendant's prior crimes before trial, but he did not believe submitting the kidnapping convictions or the jury instruction regarding them was error or unfairly prejudicial to defendant's case. On appeal, defendant's brief makes an elaborate legal argument asserting that the use or threatened use of violence is not inherent in every crime of kidnapping, and the brief dissects the jury instruction and record with precision. It is not obvious to us that defense counsel's performance at trial was objectively unreasonable; however, even assuming it was, defendant clearly cannot demonstrate the requisite component of prejudice necessary to prevail on this argument. The prejudice necessary to show ineffective assistance of counsel is demonstrated by a reasonable probability that the result would have been different had the performance of counsel not been deficient. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* We cannot find that probability here considering that (1) the common law robbery conviction alone was sufficient for the jury to find the (e)(3) aggravator; (2) the jury knew the kidnapping convictions were part of the same course of action as the common law robbery; (3) the prosecutor never even mentioned the kidnapping convictions in his closing argument, and (4) the jury also found

two other aggravating circumstances. Any deficient performance on the part of defendant's counsel was not sufficiently prejudicial for defendant to succeed on this claim. Defendant's assignments of error regarding these issues are overruled, and defendant's motion for appropriate relief is denied.

**[14]** Next, defendant assigns error to the trial court's submission of the (e)(3) aggravator (prior violent felony) to the jury based on crimes that occurred before defendant was eighteen years old and assigns error to the trial court's instruction stating the jury could consider the crimes in determining whether the (f)(1) mitigator (no significant history of prior criminal activity) existed. Defendant committed common law robbery and two counts of second-degree kidnapping on 24 January 2002, when he was sixteen years and two days old. Relying on *Roper v. Simmons*, 543 U.S. 551 (2005), defendant asserts violations of both the federal and state constitutions, and he claims he was denied effective assistance of counsel on this issue. Defendant failed to object to these matters at trial, so our review is limited to that of plain error. N.C. R. App. P. 10(c)(4).

Defendant's reliance on *Roper v. Simmons* is misplaced. The Supreme Court of the United States held in *Roper* that the "Eighth and Fourteenth Amendments [to the United States Constitution] forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578. The Court created a bright line, categorical rule. *Id.* at 574 (explaining that "a line must be drawn"). Furthermore, the Court was very clear that the issue before it concerned a defendant's age at the time he committed a capital crime, not when his case was tried and he was sentenced. *Id.* at 556. *Roper* does not preclude, or even address, the jury's ability during the sentencing proceeding to consider a defendant's acts or behavior that occurred before the age of eighteen. *Accord United States v. Wilks*, 464 F.3d 1240, 1243 (11th Cir.), *cert. denied*, 549 U.S. 1066, (2006); *England v. State*, 940 So. 2d 389, 406-07 (Fla. 2006), *cert. denied*, 549 U.S. 1325 (2007). Here, defendant committed a capital crime after he turned eighteen years old, and that simple fact carries defendant's case over the bright line drawn by *Roper*. Defendant was sixteen when he committed common law robbery and two counts of second-degree kidnapping, but he is not being sentenced to death as an additional punishment for those crimes. At most, *Roper* might suggest that a jury may still find as a mitigating factor for sentencing that a defendant committed a capital crime shortly after having passed the age of eighteen. 543 U.S. at 574. Indeed, here the jury was asked to

consider the relevance of defendant's age at the time of the capital crime as a statutory and nonstatutory mitigating circumstance. *See* N.C.G.S. § 15A-2000(f)(7) (2007). The holding of *Roper* is inapposite to the instant case, and the trial court did not commit plain error.

Additionally, defendant alleges ineffective assistance of counsel pertaining to this issue, asserting that counsel at trial should have objected to submission of the (e)(3) aggravator and to the jury instruction for the (f)(1) mitigator based on *Roper v. Simmons*. We determine we can decide the merits of this claim here because " 'the cold record reveals that no further investigation is required.' " *State v. Thompson*, 359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004), *cert. denied*, 546 U.S. 830 (2005) (citation omitted). On this issue, defendant can establish neither deficient performance by counsel nor prejudice. *See Strickland*, 466 U.S. at 687. As stated, *Roper* has no application to this case, and accordingly, defendant's counsel did not deficiently perform by failing to object on the basis of *Roper*. Defense counsel specifically referred to *Roper* during the closing arguments of the penalty proceeding, attempting to persuade the jury to view defendant's age as mitigating. It was not deficient performance, much less prejudicial, for counsel to not object on the basis of *Roper*. Defendant's federal and state constitutional rights were not violated, and these assignments of error are overruled.

**[15]** Next, defendant assigns error to the trial court's instruction to the jury regarding the (f)(7) mitigating circumstance. N.C.G.S. § 15A-2000(f)(7) (age at the time of the crime). Defendant was eighteen years, five months old when he murdered Mrs. Bennick. He makes three arguments regarding the potentially mitigating value of his age. He contends the trial court committed plain error by failing to direct a verdict to the jury, by failing to give a peremptory instruction, and by instructing the jury they could assign no weight to the circumstance of defendant's age even if they found it to exist. Defendant's trial counsel did not request a peremptory instruction or object to the instruction as given; therefore, our review is for plain error. N.C. R. App. P. 10(c)(4).

This Court has recognized the appropriateness of a mandatory peremptory instruction when a defendant and the State stipulate to the existence of a mitigating circumstance. *See Holden*, 346 N.C. at 427-28, 488 S.E.2d at 526 (distinguishing *State v. Flippen*, 344 N.C. 689, 477 S.E.2d 158 (1996), in which the State and the defendant stipulated that the defendant had no significant history of prior criminal

activity).[8] Here, the State did not stipulate to defendant's age as constituting a mitigating circumstance. Thus, a mandatory peremptory instruction was not required.

A peremptory instruction should be given when requested if any statutory or nonstatutory mitigating circumstance is supported by " 'uncontroverted and manifestly credible evidence,' " *State v. Forte,* 360 N.C. 427, 440, 629 S.E.2d 137, 146, *cert. denied,* 549 U.S. 1021 (2006) (citation omitted); however, "[t]he general rule is that 'even where all of the evidence supports a finding that the mitigating circumstance exists and a peremptory instruction is given, the jury may nonetheless reject the evidence and not find the fact at issue if it does not believe the evidence' " to be credible. *Holden,* 346 N.C. at 427, 488 S.E.2d at 526 (citation omitted).

Defendant did not request a peremptory instruction, nor did the trial court give one. Now, for the first time on appeal, defendant argues his age had mitigating value as a matter of law, which required the trial court to give a peremptory instruction or at least required an instruction that if the jury found the evidence satisfied them as to defendant's chronological age, youthfulness, and immaturity, then the jury was required to find the (f)(7) mitigator and give it mitigating value. Defendant's argument is meritless. The trial court's instruction to the jury mirrored the pattern jury instruction, titled "Death Penalty—Issues and Recommendation as to Punishment,"[9] which faithfully reflects our case law regarding mitigator (f)(7). *See* 1 N.C.P.I.—Crim. 150.10. It is well settled under this Court's precedent that " '[u]nless a defendant's age has mitigating value as a matter of law, a juror need consider the defendant's age as mitigating only if that juror finds by a preponderance of the evidence that his age has mitigating value.' " *State v. Maske,* 358 N.C. 40, 59, 591 S.E.2d 521, 533 (2004) (quoting *Rouse,* 339 N.C. at 105, 451 S.E.2d at 569 (alteration in original)).

---

8. A mandatory peremptory instruction on a particular circumstance is akin to a directed verdict, but a directed verdict is not the appropriate device in this context. *Holden,* 346 N.C. at 427, 488 S.E.2d at 526 (citation omitted).

9. The trial court stated:

> Consider whether the age of the defendant—or consider the age of the defendant at the time of the crime.
>
> Members of the jury, the mitigating affect [sic] of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence. Age is a flexible and relative concept. The chronological age of the defendant is not always a determinative factor.

Contrary to defendant's lengthy argument in his brief that *Roper v. Simmons* should alter our understanding of youth for purposes of the (f)(7) mitigator, defendant's age at the time of the crime does not have mitigating value as a matter of law in this instance. *Roper* established a bright line rule that defendants who commit capital offenses while under the age of eighteen are not eligible for the death penalty. 543 U.S. at 574. As discussed above, *Roper's* categorical rule does not shield defendant. Accordingly, there is no reason to alter our previous holding that " 'chronological age is not the determinative factor in concluding [the (f)(7)] mitigating circumstance exists.' " *Thompson*, 359 N.C. at 99, 604 S.E.2d at 867 (citation omitted). We reiterate that " '[a]ny hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances.' " *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983) (citation omitted).

In the case *sub judice*, defendant presented evidence from forensic psychiatrist Dr. Strahl, who testified to defendant's "immaturity" and stated that defendant's "emotional age was more of a 10 to 12 year old child who had not grown up." Yet, on cross-examination of Dr. Strahl, the prosecutor drew out potential indicators of maturity in defendant's behavior. For instance, defendant's prison record reflected calculated acts of violence committed against other inmates. As well, the prosecutor highlighted that defendant was seen as a leader by some of his friends. All of this testimony was proper for the jurors to consider when deciding whether the (f)(7) mitigator existed. That mere age alone is not determinative of the (f)(7) mitigator reasonably explains why no juror found that mitigator to exist while at least one juror found defendant's age alone was a nonstatutory mitigator.[10] In sum, the trial court's instruction to the jury comported with this Court's precedent, did not run afoul of the holding in *Roper v. Simmons*, and was not error, much less plain error.

Additionally, defendant argues that the failure of defense counsel to object to the jury instruction deprived him of his constitutional right to the effective assistance of counsel. We can decide the merits of this claim based on the record. *See Thompson*, 359 N.C. at 122-23, 604 S.E.2d at 881. Neither deficient performance on the part of counsel nor prejudice to defendant's case can be established here. *See*

---

10. At least one juror found the nonstatutory mitigating circumstance "[t]hat Ryan Garcell's involvement and commission of the instant offense(s) occurred when he was five months over the age of 18 years old."

*Strickland*, 466 U.S. at 687. As explained above, the jury instruction mirrored the pattern instruction and complied with the precedent of this Court. Thus, it was not unreasonable for defense counsel to refrain from objecting to the instruction at trial. Moreover, defense counsel vigorously argued to the jury that defendant's age had mitigating value, and counsel submitted nonstatutory mitigators based on his client's age and immaturity for the jury's consideration. The performance of defense counsel was not deficient. Defendant's assignments of error are overruled.

[16] Defendant next assigns error to the trial court's failure to provide peremptory instructions *ex mero motu* on four nonstatutory mitigating circumstances. Defendant argues that failing to give these peremptory instructions prevented the jury from giving certain evidence its full mitigating value and resulted in constitutional error. Defendant contends the following four nonstatutory mitigators were supported by uncontroverted and manifestly credible evidence: (1) "That at an early age, [defendant] was raised in a home where his mother was the victim of domestic violence and was forced to seek the assistance of a battered women's shelter for protection"; (2) "That [defendant] was the subject of physical and emotional abuse growing up as a child by his father"; (3) "That six months prior to this offense, [defendant] complied with the request of his probation officer to seek mental health treatment"; and (4) "That [defendant's] involvement and commission of the instant offense(s) occurred when he was five months over the age of 18 years old." At least one juror found the first and fourth circumstances listed above to exist and to have mitigating value.

A defendant must timely request a peremptory instruction to be entitled to it. *See, e.g., State v. Roache*, 358 N.C. 243, 324, 595 S.E.2d 381, 432 (2004) (citations omitted). Here, defense counsel did not request peremptory instructions at trial and thus waived any entitlement defendant may have had to them. While appellate procedure Rule 10(c)(4) allows criminal defendants to make alleged errors not objected to at trial the basis of assignments of error when plain error is distinctly contended, this Court has held that a trial court is not required "to sift the evidence for every possible mitigating circumstance which the jury might find," nor must it "determine on [its] own which mitigating circumstance is deserving of a peremptory instruction in defendant's favor." *State v. Johnson*, 298 N.C. 47, 77, 257 S.E.2d 597, 618-19 (1979), *overruled in part on other grounds by State v. Williams*, 339 N.C. 1, 452 S.E.2d 245 (1994), *cert. denied*, 516

U.S. 833 (1995)). Therefore, we decline to review these assignments for even plain error because counsel did not request any peremptory instructions at trial and the trial court did not have any independent duty to determine whether defendant was entitled to peremptory instructions on mitigating circumstances.

Further, defendant argues he was denied the effective assistance of counsel on this issue. After reviewing the record, we determine " 'no further investigation is required' " to decide this claim. *Thompson*, 359 N.C. at 122-23, 604 S.E.2d at 881 (citation omitted). We decline to comment on counsel's performance because we conclude defendant clearly cannot demonstrate the requisite component of prejudice. *See Strickland*, 466 U.S. at 687. To establish the prejudice necessary to meet the second component of the *Strickland* test, a defendant must show that a reasonable probability exists that the result would have been different had counsel's performance not been deficient. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Defendant is unable to show the requisite prejudice because even when a peremptory instruction is given, "jurors may reject [a] nonstatutory mitigating circumstance if they do not deem it to have mitigating value." *State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993) (citations omitted). It is mere speculation to suggest that any jurors would have found the nonstatutory mitigators at issue to have mitigating value had defense counsel requested and been awarded the peremptory instructions at issue. Defendant's assignments of error are overruled.

[17] Next, defendant assigns error to the trial court's failure to give individualized instructions on each of the nonstatutory mitigating circumstances submitted to the jury. The trial court gave individualized instructions on each of the three statutory mitigating circumstances, plus the (f)(9) "catch-all" mitigator. Defendant contends this action improperly "placed the nonstatutory circumstances on a lesser footing with the jury, suggesting they were of less significance or were less worthy of consideration than the statutorily enumerated circumstances." Defendant did not object to the instructions at trial, so we will review for plain error. N.C. R. App. P. 10(c)(4).

After reviewing the record, we find that defendant's argument is simply meritless. Certainly, mitigating circumstances should not be submitted to the jury "in a manner which makes some seemingly less worthy of consideration than others." *Johnson*, 298 N.C. at 74, 257 S.E.2d at 617. However, in this case, the trial court submitted

all of the mitigating circumstances "on equal footing before the jury," *id.*, though with a slight, practical difference in the manner of delivery. When first explaining the mitigating circumstances to the jury during the penalty proceeding, the trial court stated: "Members of the jury, there are 27 possible mitigating circumstances listed on the form. And you should consider each and every one of them . . . ." Later, the trial court appropriately noted that the first three mitigating circumstances on the list were statutory and the others were nonstatutory in order to explain the different analytical process the jurors would use to find each. *See State v. Williams*, 339 N.C. at 44-45, 452 S.E.2d at 270-71 (citations omitted). Then, after the trial judge gave individualized instructions on each of the three statutory mitigators, he said:

Now, those three are statutory circumstances.

Now, for the remainder of the circumstances you will consider them arising from the evidence which you find to have mitigating value.

If one or more of you find by a preponderance of the evidence that any of those circumstances, any of the rest of the circumstances exist and also are deemed by any one or more of you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided.

If none of you find the circumstances to exist, then you would so indicate by having your foreperson write "no" in that same space.

Now, members of the jury, I will go over each of those as stated.

[The trial court then read the twenty-four nonstatutory mitigating circumstances]

If any one or more find by a preponderance of the evidence one or more of the mitigating circumstances and have so indicated by writing "yes" in the space provided after whichever one or ones of that mitigating circumstance or circumstances there were on the Issue and Recommendation form, then you would go back and answer primary Issue No. 2 "yes."

The trial court in no way, explicitly or implicitly, suggested that the nonstatutory mitigators were of less significance or were less worthy of consideration. All of the mitigators were referred to as being equal

in importance, and the manner in which they were presented did nothing to value some below others.

Defendant's reliance on *State v. Johnson* is misplaced. In *Johnson*, this Court stated that submitting to the jury "some mitigating circumstances in writing and leav[ing] others to the jury's recollection *might* be constitutionally impermissible under the reasoning of *Lockett*." *Johnson*, 298 N.C. at 74, 257 S.E.2d at 616-17 (emphasis added) (referring to *Lockett v. Ohio*, 438 U.S. 586, 593-94, 597, 602-05, 608 (1978) (plurality), in which an Ohio statute that allowed a capital sentencing authority to only consider three statutory mitigating factors and no others was deemed unconstitutional); *see also State v. Cummings*, 326 N.C. 298, 321-25, 389 S.E.2d 66, 79-81 (1990) (ordering a new sentencing proceeding when the trial court ignored defendant's request and failed to submit nonstatutory mitigators in writing to jury). In the present case, unlike *Johnson* and *Cummings*, all of the mitigators were in writing, and after each one was written the following:

> ANSWER: ____ One or more of us finds this mitigating circumstance to exist and one or more of us deems this circumstance to have mitigating value.

Defendant alleges the nonstatutory mitigators received "rushed treatment." However, if anything, the trial court's manner of presentation spared the jury the possibly mind-numbing, trance-inducing experience of hearing the same individualized instruction repeated twenty-four times. Jurors need adequate instructions, but they do not need to hear them repeated *ad nauseam*. *See State v. Gainey*, 355 N.C. 73, 107, 558 S.E.2d 463, 485, *cert. denied*, 537 U.S. 896 (2002). These assignments of error are overruled.

### Closing Argument

[18] Defendant contends the trial court should have intervened *ex mero motu* to halt the prosecutor's references to defendant's constitutional rights during the closing argument of the sentencing proceeding. In context, the prosecutor stated:

> Mrs. Bennick, Margaret Bennick, had a right to live beyond June 22nd of 2004. She had a right to be secure in her own home. And this man did not care about her rights. He violated her rights.

> He is big on rights now. He wants his right to a trial, his right to two very good lawyers, his right to due process, to the pre-

sumption of innocence, to reasonable doubt. Yes, he wants all of his rights now. But what about Mrs. Bennick? What about her rights? What are we going to do about that?

" '[W]e will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair.' " *Raines*, 362 N.C. at 14, 653 S.E.2d at 134 (citations omitted). "[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Mann*, 355 N.C. 294, 307, 560 S.E.2d 776, 785 (2002) (citations and quotation marks omitted), *cert. denied*, 537 U.S. 1005).

We have declined to find gross impropriety in similar cases. For instance, in *State v. Basden*, the prosecutor pointed out to the jury that the defendant was "getting every right in the book. He's been fed. He's had a warm place to stay. He's had the best health care money can buy. He's not got one lawyer, but he's got two lawyers to defend him." 339 N.C. 288, 306, 451 S.E.2d 238, 248 (1994), *cert. denied*, 515 U.S. 1152 (1995). The prosecutor in *Basden* further contrasted the defendant's treatment with that of the victim who "never had the opportunity to be presumed innocent" and "never had the lawyers, two lawyers to plead for his life" and so on. *Id.* We did not find gross impropriety in *Basden* or similar cases. *See, e.g., State v. Geddie*, 345 N.C. 73, 101, 478 S.E.2d 146, 160 (1996), *cert. denied*, 522 U.S. 825 (1997).

After properly reviewing the broader context of the prosecutor's argument, *see Raines*, 362 N.C. at 14, 653 S.E.2d at 135, we find no gross impropriety. The prosecutor encouraged the jury to consider that Mrs. Bennick as a human being possessed certain "rights," and the jury needed to contemplate its decision in light of those rights and in light of defendant's complete disregard for his victim's rights. The prosecutor argued that defendant cared about his own rights, but did not care about his victim's rights, and so the jury needed to vindicate Mrs. Bennick's rights. The prosecutor never disparaged defendant for exercising his rights as an accused criminal, nor did he imply defendant somehow deserved the death penalty because he had exercised his rights. This assignment of error is overruled.

[19] Defendant challenges another aspect of the prosecutor's closing argument during the penalty proceeding by assigning error to the trial court's failure to intervene *ex mero motu* when the prosecutor allegedly urged the jury to deter crime in general and allegedly personalized the crime to the jurors. Defendant asserts the prosecutor's following statements contained grossly improper remarks:

> You folks . . . are the voice of the community. You're going to set a standard here in this case. . . . Not how it's going to be handled in California, New York, or even Chapel Hill, Durham, but in Rutherford County. . . . Are we going to tolerate a crime like this, actions like this against elderly ladies? . . . What is the standard going to be in this community?
>
> . . . .
>
> . . . It didn't matter to Ryan Garcell who that was that he killed. He didn't care. It could have been me, it could have been you, it could have been your grandmother. . . .
>
> . . . .
>
> Remember Dr. Jason's testimony about what it's like as you're being strangled to death. Think about that instant when you hold your breath too long. What does that feel like? Imagine that. What did he tell us? At a minimum, 10 to 15 seconds of excruciating pain and unbelievable terror. And depending on how it was done, it may have lasted for minutes.
>
> . . . .
>
> . . . You can give [defendant] the lesser punishment if you want to. Slap him on the wrist with a little old life sentence. Is that the message you want to go out of this courtroom? . . .
>
> . . . .
>
> . . . [A death verdict] would be a verdict which says that in this community we're not going to put up with this. You do this in Rutherford County, . . . and you will be punished as harshly as the law allows.

Defendant asserts the comments fall into two general categories, in that they either request the jury to set a community standard or make an emotional appeal encouraging jurors to personalize the crimes. We examine the comments within the frameworks of these two categories.

First, regarding the prosecutor's reference to a community standard, this Court has held that "arguments based on general deterrence—that is, that the jury should impose the death penalty in the case before it to deter others from committing similar crimes—are improper. However, it is not improper for the State to 'remind the jurors that "they are the voice and conscience of the community." ' " *State v. Fletcher*, 354 N.C. 455, 484, 555 S.E.2d 534, 552 (2001) (citations omitted), *cert. denied*, 537 U.S. 846 (2002). In *Fletcher*, the prosecutor made similar comments to the jury, including: " 'Your voice, through this verdict, will ring out loud and clear . . . . Say, through your verdict, We will not tolerate one bit of murder or assault and battery. If you do this, you will pay the ultimate price. That's the right message that needs to come out of this case . . . .' " *Id.* at 483-84, 555 S.E.2d at 551-52. This Court in *Fletcher* noted that these comments, taken in context, were "arguably a reference to general deterrence," but did not constitute gross impropriety warranting intervention *ex mero motu*. *Id.* at 484, 555 S.E.2d at 552. The case at bar is nearly identical.

Second, regarding comments that allegedly personalized the jurors to the crime, this Court has stated that " 'asking the jurors to put themselves in place of the victims will not be condoned,' " *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (citation omitted), *cert. denied*, 512 U.S. 1254 (1994); however, it is permissible for the prosecution to "ask[] the jury to imagine the emotions and fear of a victim, " *State v. Wallace*, 351 N.C. 481, 529, 528 S.E.2d 326, 356 (citation omitted), *cert. denied*, 531 U.S. 1018 (2000). Jurors may also be urged to "appreciate the circumstances of the crime." *State v. Artis*, 325 N.C. 278, 325, 384 S.E.2d 470, 497 (1989) (citation and quotation marks omitted), *sentence vacated on other grounds*, 494 U.S. 1023 (1990).

In *McCollum*, jurors were "repeatedly asked . . . to imagine the victim as their own child." 334 N.C. at 224, 433 S.E.2d at 152. This Court, in *McCollum*, assumed *arguendo* such arguments were improper, but concluded the defendant's rights were not violated when the statements were considered in context. *See id.* at 225, 433 S.E.2d at 152-53. In *Artis*, we found no error when jurors were asked to imagine the victim's strangulation and rape in an isolated section of woods and were asked to hold their breath as long as possible during a four minute interval while they considered the evidence in the case. 325 N.C. at 324, 384 S.E.2d at 496. In *State v. Gregory*, we found no error when the prosecutor vividly described the strangulation,

rape, and murder of two women and told the jury, "[T]ry to imagine—I don't believe any of us are capable of imagining the pure horror that was going on there . . . that night." 340 N.C. 365, 425, 459 S.E.2d 638, 673 (1995), *cert. denied*, 517 U.S. 1108 (1996).

As in *Artis* and *Gregory*, we conclude here that the prosecutor asked the jury to appreciate the circumstances of the crime and permissibly made arguments "related to the nature of defendant's crimes." *Id.* at 426, 459 S.E.2d at 673. Particularly when a prosecutor is arguing the murder was especially heinous, atrocious, and cruel, it is permissible to ask jurors to imagine the situation based on the evidence and to facilitate a thorough and meticulous contemplation of the crime. The prosecutor never descended to degrading comments or conclusory "name-calling." *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (finding it grossly improper and prejudicial when the prosecutor referred to the defendant, stating: "You got this quitter, this loser, this worthless piece of—who's mean. . . . He's as mean as they come. He's lower than the dirt on a snake's belly."). Even assuming *arguendo* the prosecutor's remarks were improper, similar to *McCollum*, we cannot conclude they were grossly improper to the extent they violated defendant's rights when viewed in the larger context of the prosecution's entire closing argument. Defendant's assignments of error are overruled.

## PRESERVATION ISSUES

Defendant alleges: (1) the first-degree murder indictment was insufficient to charge him with first-degree murder because it did not allege all the elements of first-degree murder; (2) the first-degree murder indictment was insufficient to support a sentence of death because it failed to allege any aggravating circumstances; (3) the trial court erred by giving the jury vague and confusing instructions as to Issue Three of the Issues and Recommendation as to Punishment Form; (4) the trial court erred by denying defendant's motion to prohibit death qualification *voir dire* questions of the jury; (5) the trial court erred by instructing the jury that at Issues Three and Four on the Issues and Recommendation as to Punishment Form, each juror may consider the mitigating circumstances found by that juror, rather than any mitigating circumstance found by any juror; (6) the trial court erred by instructing the jury at Issue Four on the Issues and Recommendation as to Punishment Form that each juror may, rather than must, consider the mitigating circumstances found by that juror; (7) the trial court erred by instructing the jurors that they must be

unanimous to answer "No" to Issues One, Three, and Four on the Issues and Recommendation as to Punishment Form; (8) the trial court erred by denying defendant's motion to allow defense counsel to question any potential jurors who were challenged for cause by the State based on opposition to the death penalty; (9) the trial court erred by instructing jurors to give no effect to proffered nonstatutory mitigating circumstances if the jurors found them to have no mitigating value; and (10) the death penalty is inherently cruel and unusual, and North Carolina's sentencing procedure is unconstitutionally arbitrary, vague, and overbroad. We have considered all of defendant's arguments and decline to overrule our precedent holding them to be without merit. *See State v. Duke*, 360 N.C. 110, 141-42, 623 S.E.2d 11, 31-32 (2005), *cert. denied*, 549 U.S. 855 (2006).

## PROPORTIONALITY REVIEW

[20] Because we have concluded defendant's trial and capital sentencing proceeding were free from prejudicial error, we turn to the three requirements of N.C.G.S. § 15A-2000(d)(2) and consider:

> (1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant.

*Raines*, 362 N.C. at 24, 653 S.E.2d at 141 (citing N.C.G.S. § 15A-2000(d)(2) (2005)).

First, we find that the record supports the aggravating circumstances the jury found. The jury found three aggravating circumstances: (1) Defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) The murder was committed while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); and (3) The murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

In support of the aggravating circumstances, the State introduced certified copies of judgments from Carteret County showing defendant's prior convictions on 3 September 2002 for common law robbery and second-degree kidnapping. This evidence was sufficient to support the (e)(3) aggravating circumstance. Furthermore, the record

indicates defendant stole various items from the victim's residence, including groceries, a VCR, a game console, jewelry, a coin collection, clothes, and an ATM card. This evidence was sufficient to support the (e)(5) aggravator. Finally, this Court has characterized the types of murders for which the (e)(9) aggravator is appropriate. "One type includes killings physically agonizing or otherwise dehumanizing to the victim. A second type includes killings less violent but conscienceless, pitiless, or unnecessarily torturous to the victim, including those which leave the victim in her last moments aware of but helpless to prevent impending death." *State v. Elliott*, 360 N.C. 400, 424, 628 S.E.2d 735, 751 (citation and internal quotation marks), *cert. denied*, 549 U.S. 1000 (2006). The present case fits both of these categories. Similar to *State v. Elliott*, in which the victim was beaten and strangled to death in her home, *id.* at 424-25, 628 S.E.2d at 751, defendant manhandled, brutally choked, and strangled his victim, a seventy-one year old woman, to death within the perceived sanctuary of her own residence. "[S]trangulation [is] a method of murder which takes" a length of time, during which a victim is "aware of [] impending death but helpless to prevent it." *Id.* at 425, 628 S.E.2d at 751. Mrs. Bennick struggled and waved her arms, trying to get loose, while defendant strangled her. Moreover, defendant tied an electrical extension cord around Mrs. Bennick's neck and further desecrated her remains by riding her limp body like a horse, saying, "Giddy up, giddy up." The evidence was sufficient to support the (e)(9) aggravator.

Second, we find that defendant's sentence of death was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." N.C.G.S. § 15A-2000(d)(2) (2007). Defendant suggests three items as indicative of the arbitrary nature of his sentence: the alleged errors concerning the (e)(3) aggravating circumstance; the alleged inconsistent jury findings on the mitigating value of defendant's age; and the alleged inconsistent jury findings regarding the significance of defendant's prior criminal activity. However, as already discussed, we have overruled defendant's assignments of error relating to the (e)(3) aggravator, and we have found rational explanations for the jury's conclusions regarding the relevance of defendant's age and his prior criminal activity. Further, defendant argues it is inconsistent that no juror found the (f)(1) mitigator (no significant history of prior criminal activity) but at least one juror found the nonstatutory mitigator that defendant's "only prior felony convictions arose from his participation in crimes which occurred when he was one day over the age of 16 years old and was [sic] committed in the company of older co-defendants." However, the two circumstances are not

identical and can be easily harmonized. It is rational for all jurors to find that defendant's prior criminal activity was significant, and yet, for at least one juror to conclude defendant's age and the presence of older companions to have mitigating value. In essence, to at least one juror, defendant's prior criminal activity was not as significant as it could have been, but it was significant nonetheless. Consequently, our review of the record and transcripts leads us to conclude that a sentence of death was not imposed against defendant arbitrarily or capriciously. Therefore, defendant's assignments of error asserting as much are overruled.

Third, we find that defendant's sentence of death was not excessive or disproportionate when compared to the penalties imposed in similar cases. We have the unique responsibility of considering defendant and his crimes and determining whether defendant's sentence is proportionate. *Raines*, 362 N.C. at 25, 653 S.E.2d at 142 ("The determination of proportionality . . . is ultimately dependent upon the sound judgment and experience of the members of this Court." (citations omitted)). "In making this determination, we consider 'all cases which are roughly similar in facts to the instant case, although we are not constrained to cite [or discuss] each and every case we have used for comparison.'" *Id.* at 25, 653 S.E.2d at 141 (citations omitted). "'[O]nly in the most clear and extraordinary situations may we properly declare a sentence of death which has been recommended by the jury and ordered by the trial court to be disproportionate.'" *Id.* at 25, 653 S.E.2d at 142 (quoting *State v. Chandler*, 342 N.C. 742, 764, 467 S.E.2d 636, 648, *cert. denied*, 519 U.S. 875 (1996)) (alteration in original).

This Court has determined that a defendant's sentence of death was disproportionate in only eight cases: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

The present case is dissimilar to any of the cases in which we have found a sentence of death disproportionate. Indeed, this Court has only found the death sentence disproportionate in two cases in

which the jury concluded the murder was "especially heinous, atrocious, or cruel" under N.C.G.S. § 15A-2000(e)(9). *See Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170. Additionally, this Court has only found the death sentence disproportionate in two cases in which the jury found more than one aggravating circumstance. *See Young*, 312 N.C. 669, 325 S.E.2d 181; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170.

In *Stokes*, multiple factors not present in the instant case persuaded this Court that the death sentence was disproportionate. Those factors included that the defendant was a juvenile at the time of the murder; there was evidence of the defendant's impaired capacity to appreciate the criminality of his conduct and that he was under the influence of a mental or emotional disturbance; and the defendant was the only one of four assailants to receive the death penalty. 319 N.C. at 3-4, 11, 21, 352 S.E.2d at 654-55, 658, 664; *see also Duke*, 360 N.C. at 144, 623 S.E.2d at 33 (discussing and applying *Stokes*). In *Bondurant*, the defendant exhibited remorse immediately after the victim was shot and aided the victim in receiving treatment at the nearest hospital. 309 N.C. at 694, 309 S.E.2d at 182-83; *see also Duke*, 360 N.C. at 144, 623 S.E.2d at 33 (discussing and applying *Bondurant*). In *Young*, the defendant committed the murder with the assistance of accomplices. Specifically, the defendant stabbed the victim twice in the chest but one of his companions " 'finished him' by stabbing him several more times." 312 N.C. at 688, 325 S.E.2d at 193.

The instant case is distinguishable from *Stokes*, *Bondurant*, and *Young*. Here, defendant was not a juvenile at the time of the murder, and although Proctor encouraged him in the murder, defendant alone strangled his victim to death. Furthermore, defendant did not exhibit any remorse after the murder; rather, after the victim's body lay limp on the floor, defendant wrapped a brown electrical extension cord around Mrs. Bennick's neck and, in his own words, rode her like a horse. Immediately after the murder, defendant described the killing to his friends with a "smile on his face."

"[C]onsidering both the crime and the defendant," N.C.G.S. § 15A-2000(d)(2), we view the case *sub judice* to be factually similar to cases in which this Court has held the death sentence proportionate. Defendant was convicted of first-degree murder on the basis of malice, premeditation and deliberation and felony murder. "[T]his Court has *repeatedly* noted that a finding of first-degree murder based on theories of premeditation and deliberation and of felony

murder is significant." *State v. Watts*, 357 N.C. 366, 380, 584 S.E.2d 740, 750 (2003) (emphasis added) (citations and internal quotation marks omitted), *cert. denied*, 541 U.S. 944 (2004). Moreover, "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Id.* (citations and quotation marks omitted).

The present case is also similar to *State v. Brown*, 357 N.C. 382, 584 S.E.2d 278 (2003), *cert. denied*, 540 U.S. 1194 (2004), in that the defendant in *Brown* "committed a premeditated and deliberate murder" within the sanctity of the victims' residence. *Id.* at 394, 584 S.E.2d at 285-86. Murder of a victim within his or her own home "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34 (citation omitted), *cert. denied*, 484 U.S. 970 (1987). In *State v. Elliott*, we also noted that the defendant strangled the victim to death within the victim's residence. 360 N.C. at 424-25, 628 S.E.2d at 751. As in *Brown* and *Elliott*, defendant in the present case violated the safety and sanctuary of Mrs. ·Bennick's residence to commit this murder. Moreover, as in *Elliott*, defendant in this case committed the brutal murder by strangulation. Strangulation causes a particularly agonizing death, in which a victim is "aware of her impending death but helpless to prevent it." *Id.* at 425, 628 S.E.2d at 751; *see also State v. Sexton*, 336 N.C. 321, 377, 444 S.E.2d 879, 911 (noting that "a brutal strangulation, found by the jury to be especially heinous, atrocious, or cruel" was a "[s]alient characteristic[]" of the case), *cert. denied*, 513 U.S. 1006 (1994).

This case is also similar to *State v. Smith*, 359 N.C. 199, 607 S.E.2d 607. In *Smith*, the defendant attacked his seventy-three year old victim in the victim's home, and choked the victim to death by pressing his forearm against the victim's throat. *Id.* at 223-24, 607 S.E.2d at 624-25. The defendant "bound the victim's hands and legs and wrapped tape around the victim's face," *id.* at 224, 607 S.E.2d at 625, in addition to using a "clock's extension cord [] to bind [the victim's] wrists and then his ankles," *id.* at 203, 607 S.E.2d at 612. The defendant in *Smith* committed the murder in the course of a robbery, ending the life of the victim for nothing more than money. *Id.* Here, defendant choked his seventy-one year old victim in the perceived safety of her own home, then wrapped an extension cord around her neck while unconscionably riding her body like a horse. Furthermore,

**GILBERT v. N.C. STATE BAR**

[363 N.C. 70 (2009)]

like the victim in *Smith*, Mrs. Bennick was needlessly murdered, only for the sake of defendant's desire for material possessions.

Finally, this Court has concluded that both the (e)(5) and the (e)(9) aggravators standing alone are sufficient to sustain a death sentence. *See Watts*, 357 N.C. at 381, 584 S.E.2d at 751 (citations omitted). Here, the jury found both the (e)(5) and (e)(9) aggravators. Defendant's sentence is not excessive or disproportionate.

## CONCLUSION

Defendant has made other assignments of error, but has not provided any argument or supporting authority for these assignments in his brief. Consequently, we consider those assignments of error abandoned, and they are dismissed. *See* N.C. R. App. P. 28(b)(6); *Raines*, 362 N.C. at 26, 653 S.E.2d at 142.

For the foregoing reasons, we conclude defendant received a fair trial and sentencing proceeding, and we find no error in his convictions or his sentences. Moreover, we conclude that defendant's sentence of death is not disproportionate and should remain undisturbed.

NO ERROR; MOTION FOR APPROPRIATE RELIEF DENIED.